EBENEZER GARCÍA CABÁN, CARMEN MILAGROS ALSINA, ETC., demandantes y recurridos, *v.* UNIVERSIDAD DE PUERTO RICO, COLEGIO REGIONAL DE CAYEY, ETC., demandados y recurrentes.

*Números:* RE-86-121      *Resueltos:* 22 de diciembre de 1987
RE-86-217

*Juan A. Moldes Rodríguez, Rubén T. Nigaglioni* y *Eric R. Ronda Del Toro,* de *Ledesma, Palou & Miranda,* abogados de los recurrentes; *Rafael González Vélez* y *Carlos J. Morales Bauzá,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Revocamos la sentencia del Tribunal Superior, Sala de San Juan, que declaró con lugar una demanda de *injunction* permanente y daños y perjuicios, y ordenó la "reinstalación" del demandante Ebenezer García Cabán a una plaza de Catedrático Auxiliar por contrato, con carácter probatorio, en el Colegio Universitario de Cayey. Ante nos la Universidad de Puerto Rico plantea que las doctrinas de jurisdicción primaria y agotamiento de remedios administrativos impedían al demandante acudir al foro judicial en primera instancia. Resolvemos que las circunstancias de este caso no demuestran que hubiese necesidad de utilizar el recurso extraordinario de *injunction* y así eludir el ordenado cauce administrativo.

I

La Universidad de Puerto Rico, como toda institución de enseñanza superior, periódicamente evalúa a su personal docente a los fines de comprobar su ejecutoria e idoneidad para continuar ocupando una plaza docente, para considerar posibles ascensos en rango académico y la concesión de permanencia.

Las normas, criterios y procedimientos para efectuar tal evaluación son aquellas que establecen el Reglamento General de la Universidad de Puerto Rico (Reglamento General) y el Presidente de la Universidad.[1] Por disposición reglamentaria la evaluación directa la llevan a cabo los comités de ascenso y permanencia a tenor con las normas de cada facultad.[2]

El proceso de evaluación del personal docente que no tiene permanencia en el Colegio Universitario de Cayey dispone: (1) una visita al salón de clases por parte del Comité de Personal del Departamento de Humanidades (Comité de Personal), compuesto por tres profesores electos por los miembros de dicho departamento; (2) una visita al salón de clases a cargo del Director del Departamento, y (3) una evaluación por los estudiantes a tenor con un formulario preparado para tal propósito.[3]

Durante la visita al salón de clases que efectúa el Comité de Personal, sus miembros preparan una evaluación. Luego, el Comité de Personal se reúne y complementa una hoja de evaluación conjunta donde se resume la puntuación que cada evaluador le dio al profesor y la puntuación del comité en

---

[1] Sec. 49.1, Reglamento General de la Universidad de Puerto Rico (Reglamento General), 1ro de abril de 1981.

[2] Dichas normas deben ser congruentes con el Reglamento General. Art. 49, Sec. 49.2.

[3] Dicho procedimiento complementa las normas de evaluación del personal docente y tiene rango reglamentario en atención a lo dispuesto en la Sec. 14.11 del Reglamento General.

pleno. La evaluación del Comité de Personal, la del Director del Departamento y la de los estudiantes pasa entonces a la consideración del Comité de Personal Institucional (Comité Institucional), compuesto por representantes de todos los departamentos académicos del Colegio Universitario de Cayey. Aunque la evaluación directa del personal docente la efectúan los Comités de Personal y la Facultad, la decisión de terminar un nombramiento probatorio corresponde en este caso al Rector.[4]

Como norma general, para propósitos de una recomendación al rector sobre la retención o no retención de un profesor sin permanencia, el Comité Institucional considera decisiva una puntuación de 220 en la evaluación de un profesor. Si la evaluación de dos de los tres organismos asciende a 220 puntos o más, en principio se recomienda la retención del empleado. Si dos de los tres cuerpos evaluadores le otorgan al profesor una puntuación inferior a los 220 puntos, generalmente no se recomienda la retención del empleado.

Durante el año 1983–1984 García Cabán se desempeñó como Catedrático Auxiliar de Humanidades en el Colegio Universitario de Cayey, mediante contrato probatorio. Fue evaluado el primer semestre del año académico por el Comité de Personal y el Director del Departamento de Humanidades, y por sus estudiantes. El resultado de tales evaluaciones fue el siguiente: el director consideró la labor docente del profesor como "regular" (206 puntos), el Comité de Personal la consideró "deficiente" (122 puntos), y los estudiantes la consideraron "buena" (323 puntos). A tenor con estos resultados se recomendó no otorgarle un nuevo contrato docente al recurrido.

---

[4] Sec. 50.7, Reglamento General. Al parecer, con posterioridad a la adopción del Reglamento General, el Colegio Universitario de Cayey se convirtió en una unidad autónoma de la Universidad de Puerto Rico.

No satisfecho con las evaluaciones de que fue objeto, García Cabán apeló ante el Comité de Personal Institucional. Allí se elevaron las evaluaciones de su labor docente. El caso se asignó para evaluación ulterior al Dr. René Hernández Toledo, el propio presidente del Comité Institucional, quien al completar el examen del caso no encontró méritos en los planteamientos del apelante. Así lo informó al Comité Institucional. Luego de considerar dicho comité en pleno el caso del profesor García, procedió a votar unánimemente con una abstención, una recomendación de que no se le retuviera como miembro del personal docente de la institución.

Esta recomendación pasó entonces a la consideración del Rector del Colegio Universitario de Cayey. El Rector ordenó otra evaluación del caso que tampoco resultó favorable al recurrido. Terminado dicho proceso, el Rector José Luis Monserrate decidió no otorgarle un nuevo contrato probatorio al profesor.

El 18 de enero de 1984 García Cabán apeló ante el Presidente de la Universidad la decisión del Rector. El 23 de enero de 1984 el oficial examinador designado por el Presidente de la Universidad le concedió al recurrido quince (15) días para someter su memorando de autoridades en apoyo de la apelación. En esa misma fecha el profesor desistió de la apelación incoada, pero el 14 de febrero la inició nuevamente.

El 7 de marzo de 1984 el Presidente de la Universidad devolvió el caso al Colegio Universitario de Cayey, con instrucciones de que se le concediera a García Cabán una vista. Se designó un nuevo oficial examinador. Éste citó a las partes a una reunión preliminar para el 18 de junio y se señaló la vista para el 27 de agosto de 1984. Después de suspenderse la vista en dos ocasiones a solicitud del profesor, éste instó el 1ro de octubre de 1984 la demanda de *injunction* que origina este recurso.

La causa de acción se basó en la Ley Núm. 12 de 8 de agosto de 1974, según enmendada, 32 L.P.R.A. sec. 3524, también conocida por Ley de Derechos Civiles. En síntesis, se alegó discrimen por razones de "interés económico y motivos políticos e ideológicos". Se demandó a la Universidad y a varios funcionarios en su carácter personal.

Luego de una vista sobre *injunction* preliminar el tribunal de instancia determinó que García Cabán no tenía que agotar remedios administrativos, habida cuenta de que dicho recurso constituía una gestión inútil e inefectiva. Concluyó que en las evaluaciones que se le hicieron no se siguieron todos los criterios establecidos y que el Comité de Personal actuó movido por personalismos y prejuicios filosóficos e ideológicos. Por lo tanto, declaró con lugar la solicitud de *injunction* preliminar y ordenó a las autoridades universitarias reinstalar al recurrido en su posición hasta que fuera sometido nuevamente a evaluación, en la que no debían participar los anteriores evaluadores. Posteriormente, el 3 de enero de 1984 el tribunal a quo se ratificó en la orden al dictar un *injunction* permanente en los mismos términos dispositivos.

De esta sentencia y orden recurrieron tanto la Universidad como el profesor. El último se queja de que el tribunal de instancia no lo reinstalara en su posición con *carácter permanente*. La Universidad nos pide que revoquemos la sentencia objeto de este recurso por constituir una intervención judicial en violación de los principios de libertad académica y en preterición de las doctrinas de jurisdicción primaria y agotamiento de remedios administrativos. Argumenta igualmente que García Cabán, por ser empleado público con carácter probatorio, no tiene derecho propietario en la retención de su empleo y, por lo tanto, puede ser separado de su puesto a discreción de la autoridad nominadora.

En atención a la *ratio* de la opinión que hoy emitimos, no es necesario, en buena técnica adjudicativa, pronunciarnos en torno a esta última cuestión. Sin embargo, un examen de las normas estatutarias y reglamentarias pertinentes demuestra que la intención del legislador fue claramente delegar a la Universidad de Puerto Rico amplios poderes en materia de derechos y deberes de sus empleados. 18 L.P.R.A. sec. 602(b)(5) y (e)(12). En este caso la Universidad, en cumplimiento con el mandato de la Asamblea Legislativa, estableció un Reglamento General que delimita el alcance de sus poderes en las áreas de selección, evaluación, retención y ascenso de su personal docente. En presencia de adecuadas salvaguardas legales y reglamentarias que reducen la posibilidad de arbitrariedad y facilitan nuestra revisión judicial, *Torres Arzola* v. *Policía de Puerto Rico*, 117 D.P.R. 204 (1986), no es necesario pronunciamiento ulterior sobre el planteamiento de debido proceso de ley. Reiteramos, como normativa de derecho administrativo, que una vez una agencia ha promulgado unos reglamentos para facilitar su proceso decisional y limitar el alcance de su discreción, viene obligada a observarlos estrictamente y no queda a su soberana voluntad reconocer o no los derechos que ella misma le ha extendido a sus empleados. *Díaz de Llovet* v. *Gobernador*, 112 D.P.R. 747, 757 (1982); *García* v. *Adm. del Derecho al Trabajo*, 108 D.P.R. 53 (1978); *Hernández García* v. *J.R.T.*, 94 D.P.R. 22, 29 (1967). Véase *Brandywine AFF. NCCEA/ DSEA* v. *Brandywine Bd. of Ed.*, 555 F. Supp. 852, 863–864 (1983).

La Universidad concede y se allana a la premisa de que su discreción —independientemente de la naturaleza del derecho implicado— tiene que ejercitarse conforme a criterios constitucionales. Si la decisión de no renovar el contrato a García Cabán fue motivada por criterios inconstitucionales, ésta no se puede sostener. En otras palabras, el profe-

sor tiene derecho a que no se le niegue la permanencia en la Universidad por razón de discrimen, prohibido por la Constitución o leyes aplicables. Art. II, Sec. 1 de la Carta de Derechos, Documentos Históricos, L.P.R.A. Tomo 1; *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982 (1972).

El profesor, por su parte, en forma alguna rebate el hecho de que a tenor con el Art. 14, Sec. 14.10 del Reglamento General, se autorizó al presidente de la Universidad a preparar y someter al Consejo de Educación Superior para su aprobación, una serie de reglamentos entre los que se encuentra el "Reglamento de Procedimientos Apelativos para el Sistema Universitario". Dicho reglamento se aprobó el 14 de mayo de 1982 y es extensivo a toda apelación administrativa que se interponga en el sistema universitario, incluso las apelaciones a los rectores, *el Presidente de la Universidad, la Junta Universitaria* y *el Consejo de Educación Superior*.(⁵)

■ La Sec. 6 del Reglamento General provee el procedimiento de apelación e indica la forma de iniciarlo; los escritos que podrán ser requeridos (6.5); para determinación preliminar y disposición sumaria del recurso (6.6); para el nombramiento de oficiales examinadores (6.7); para la celebración de vistas administrativas (6.10, 6.11); para la presentación de evidencia (6.15); para someter memorandos (6.16); para la preservación del récord de las vistas (6.17); reconsideraciones (6.19); remedios temporeros (6.20), y otras disposiciones de carácter procesal. Los remedios que se proveen son enérgicos y eficaces. Se dispone que la autoridad apelativa puede revocar, confirmar o modificar la decisión o resolución apelada, así como anular, confirmar o modificar cual-

---

(⁵) Corresponde al Consejo de Educación Superior, por mandato legal, resolver las apelaciones que se interponen contra las decisiones del Presidente y de la Junta Universitaria. 18 L.P.R.A. sec. 602(e)(6).

quier diligencia posterior. A estos efectos dicho organismo emitirá una resolución con determinaciones de hecho y de derecho y, además, la siguiente información: funcionario u organismo ante quien se podrá apelar o solicitar revisión; términos para solicitarla, y término para solicitar una reconsideración. En fin, el Reglamento General es vasto en las materias que abarca.

En estas circunstancias, la controversia primordial en este caso es si los hechos justifican que prescindamos de las normas generales de jurisdicción primaria y agotamiento de remedios administrativos. En otras palabras, para evaluar la procedencia de la revisión judicial en esta etapa hay que primero examinar si la reclamación del profesor García Cabán reviste tal urgencia o intensidad que amerite eludir el cauce administrativo.

## II

La respuesta de nuestra jurisprudencia al problema de distribución de funciones entre los organismos administrativos y los tribunales es compleja. La decisión de requerir o no el agotamiento de los remedios no depende de criterios rígidos, sino de si a la luz de las circunstancias del caso y *pericia particular de la agencia,* se entiende que la intervención judicial sería prematura. *Vélez Ramírez* v. *Romero Barceló,* 112 D.P.R. 716, 722–723 (1982). En éste expresamos a la pág. 722:

> Tanto la doctrina de agotamiento como la de jurisdicción primaria cumplen el objetivo de mantener un adecuado balance y distribución de poder y tareas entre las agencias administrativas y el poder judicial. *Febres* v. *Feijoó,* 106 D.P.R. 676 (1978). La doctrina de jurisdicción primaria pretende determinar si corresponde a una agencia o a un tribunal la intervención *inicial* en una controversia. En cambio, la de agotamiento se dirige a dilucidar *cuándo* es el momento apropiado para que los tribunales intervengan en una controversia pre-

viamente sometida a una intervención administrativa. Por tanto, el examinar su posible aplicación surge cuando, habiendo comenzado un procedimiento o actuación en una agencia, se solicita la intervención judicial para revisar determinaciones u obtener un remedio judicial, antes de que se haya culminado todo el trámite o procedimiento administrativo establecido. *Quiñones* v. *A.C.A.A.*, 102 D.P.R. 746 (1974), y *E.L.A.* v. *12,974.74 Metros Cuadrados*, 90 D.P.R. 506 (1964). (Énfasis en el original.)

■ La reivindicación de los derechos constitucionales corresponde y puede reclamarse en primera instancia en los tribunales de justicia, sin que el foro administrativo tenga jurisdicción original sobre ello. *Pierson Muller I* v. *Feijoó*, 106 D.P.R. 838, 852 (1978). Sin embargo, en *Febres* v. *Feijoó*, 106 D.P.R. 676, 681 (1978), sostuvimos que "al evaluar el recurso a los tribunales de justicia contra los actos de organismos o funcionarios administrativos en los casos en que el estatuto provee una apelación dentro de la vía administrativa, debe distinguirse entre cuestiones de interpretación estatutaria en que los tribunales son especialistas, y cuestiones propias para la discreción o pericia (*expertise*) administrativa".

■ En nuestra jurisdicción, las reclamaciones por lesiones a los derechos civiles bajo la Ley Núm. 12 de 8 de agosto de 1974, *supra*, han sido en todo momento evaluadas a la luz de si la acción implica o no un agravio de patente intensidad al derecho del individuo. Siempre hemos tendido a conservar el carácter excepcional del procedimiento y a limitarlo a la comprobación de situaciones urgentes. El recurso de *injunction* para impedir que se prive a una persona de algún derecho o privilegio protegido por la Constitución o las leyes del Estado Libre Asociado de Puerto Rico, o las leyes de Estados Unidos de América, no ha desplazado ni sustituido el procedimiento de apelación y revisión de decisiones

en la esfera administrativa. *First Fed. Savs.* v. *Asoc. de Condómines*, 114 D.P.R. 426, 437–438 (1983); *Santiago* v. *Superintendente de la Policía*, 112 D.P.R. 205 (1982); *Pierson Muller I* v. *Feijoó*, supra, págs. 850–851; *Otero Martínez* v. *Gobernador*, 106 D.P.R. 552 (1977).

El asunto se plantea aquí con especial intensidad. La intervención de los tribunales con las decisiones de las universidades y otros centros docentes en materia de retención y ascenso de su personal docente, suscita problemas clásicos y delicados de libertad académica y autonomía universitaria. *The Academy in the Courts: A Symposium on Academic Freedom*, 16 U.C. Davis L. Rev. 831 *et seq.* (1983).

Tradicionalmente se ha reconocido que corresponde a las universidades establecer los criterios de competencia académica de su personal docente. La cuestión generalmente es objeto de extensa reglamentación interna y evaluación por parte de un profesorado con conocimientos especializados y de vasta experiencia. La Universidad del Estado necesita cumplir con su misión educativa, libre de presiones ajenas. Sin embargo, ese cometido se debe ejercer con prudencia y en forma tal que no se menoscaben los derechos fundamentales de su personal.

Examinados los deberes, atribuciones, prerrogativas y funciones asignadas a la Universidad y el modo en que se gestan e imparten sus servicios, no existe quizás instrumentalidad o corporación pública más necesitada de reafirmación en su autonomía que esta institución. Declaración de Propósitos, Art. 1 de la Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601). Específicamente en materia de selección y ascenso de su personal docente, la deferencia de los tribunales es condición indispensable de su propia existencia. Ahora bien, aunque el Consejo de Educación Superior es un organismo sui géneris y con vastos poderes para

reglamentar la educación universitaria del país, ello no implica que los tribunales debamos asumir actitudes indiferentes o impasibles al revisar judicialmente sus decisiones. Tampoco que tengamos una competencia residual en materias sometidas *previamente* al poder reglamentario o adjudicativo del primer centro docente. De la misma manera, en estos casos el recurso de *injunction* será el remedio preciso para proteger los derechos e inmunidades de estirpe constitucional o estatutaria.

Hoy refrendamos nuestras expresiones previas. "Precisamente, para que las salvaguardas civiles no decaigan es imprescindible la crítica ilustrada, acuciosa y constante de parte de esos grupos dedicados al más elevado estudio. Callar sus denuncias puede poner en peligro las libertades que con tanta dificultad se plasmaron en un pasado no muy remoto. . . . Así lo reconoció el legislador puertorriqueño cuando dispuso que, en el cumplimiento de su misión, la Universidad de Puerto Rico debería '[t]ener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, ella está esencialmente vinculada a los valores e intereses de toda la comunidad democrática'. 18 L.P.R.A. sec. 601, inciso (b)(6)." (Escolio omitido.) *Sánchez Carambot* v. *Dir. Col. Univ. Humacao*, 113 D.P.R. 153, 161 (1982).

Resolvemos, sin embargo, que en ausencia de violaciones a derechos constitucionales, en las áreas de selección y ascenso del personal docente, los tribunales únicamente debemos intervenir en la revisión de actuaciones de organismos educativos cuando son arbitrarias o carecen de base racional. Esta función debe realizarse con cautela, particularmente cuando, mediante reglamento, la institución académica ha establecido un proceso decisional con amplias garantías de que el afectado tendrá oportunidad de ser oído. Como antes expresáramos, los jueces no contamos con la in-

formación ni el peritaje necesario en esta área. Las decisiones en materia como la presente usualmente requieren el ejercicio del juicio personal, la deliberación académica y el conocimiento profundo tanto del candidato como de la institución universitaria. *Board of Curators, Univ. of Mo.* v. *Horowitz*, 435 U.S. 78, 87, 91 (1978); *Lovelace* v. *Southeastern Massachusetts University*, 793 F.2d 419 (1er Cir. 1986); *Kumar* v. *Bd. of Trustees, University of Mass.*, 774 F.2d 1, 10–11 (1985); *Kelleher* v. *Flawn*, 761 F.2d 1079, 1084 (1985); *Siu* v. *Johnson*, 748 F.2d 238 (1984); *Clark* v. *Whiting*, 607 F.2d 634 (1979); *Huang* v. *College of the Holy Cross*, 436 F. Supp. 639, 653 (1977); *Cussler* v. *University of Maryland*, 430 F. Supp. 602, 605–606 (1977); *Hetrick* v. *Martin*, 480 F.2d 705 (1973). Véase, también, *Regents of the University of Michigan* v. *Ewing*, 474 U.S. 214 (1985). Por estas razones, la elección del foro judicial por profesores cuya contención propiamente debe dilucidarse por la vía administrativa ante las estructuras universitarias, es práctica que exige un "irrecusable grado de autenticidad y claridad en el planteamiento constitucional al amparo de la Ley de Derechos Civiles . . .". *Pierson Muller I* v. *Feijoó*, supra, pág. 853.

Con estos criterios en mente debemos determinar si el balance de intereses en este caso justifica que se agoten los remedios administrativos ante los organismos universitarios a cargo de tomar una decisión final sobre los planteamientos del profesor García, o si la reclamación formulada a la luz de la prueba ofrecida aduce hechos terminantes y precisos justificativos de la opción por el remedio constitucional y preterición del cauce administrativo.(6)

Una lectura a fondo de la transcripción de la evidencia que obra en autos, así como de la sentencia del Tribu-

---

(6) El testimonio íntegro del demandante durante la vista de *injunction* preliminar se transcribió y dicha transcripción obra en autos.

nal Superior demuestran, a lo sumo, que el profesor García Cabán posee una filosofía educativa diferente a la de sus evaluadores.[7] Las discrepancias entre los miembros de una comunidad académica en torno a la mejor forma en que debe enseñarse una materia son parte integral de las divergencias que normalmente ocurren en las universidades. *Hetrick* v. *Martin*, supra, págs. 705, 708–709. Hubo prueba de que algunos evaluadores tenían preconcepciones acerca de la capacidad docente del profesor García Cabán ya que conocían sus ejecutorias anteriores en el Colegio Universitario de Cayey. Sin embargo, los conflictos filosóficos entre evaluadores y evaluados no justifican nuestra intervención en ausencia de una demostración concreta de hechos sobre los que pueda descansar una inferencia de que la decisión de no renovar el contrato al profesor estuvo motivada por consideraciones inconstitucionales o en privación de sus derechos civiles. La prueba presentada por el profesor García Cabán no cumple ni remotamente con los criterios esbozados. En estas circunstancias, no se justifica la intervención prematura de los tribunales.

El profesor puede obtener un remedio dentro de las propias estructuras apelativas universitarias —el Presidente, y el Consejo de Educación Superior— o en el procedimiento de revisión judicial de las decisiones administrativas. "Después de todo, la norma de preferir el agotamiento de la acción administrativa es una conveniencia compatible con la justicia, que no margina el escrutinio final por los tribunales." *Vélez Ramírez* v. *Romero Barceló*, supra, pág. 727.

A la vez de que hay ausencia de un planteamiento claro de discrimen, tampoco hay prueba que respalde la determinación del foro primario en el sentido de que proseguir con el

---

[7] El recurrente es partidario del pensamiento "pragmático", corriente que es rechazada por varios de sus colegas.

trámite administrativo en el presente caso constituye una gestión inútil o inefectiva.

■ No cabe duda de que la rapidez de la justicia administrativa es condición de su eficacia. Del récord del caso se desprende, sin embargo, que el trámite administrativo no se demoró por razones atribuibles a la Universidad y que en gran medida las dilaciones ocurridas se debieron al propio recurrente. Por ejemplo, en una ocasión desistió de la apelación incoada y en otra solicitó la transferencia de la vista señalada.

En resumen, en este caso corresponde que las estructuras universitarias superiores revisen el proceso de evaluación seguido con el profesor García Cabán y determinen si se cumplió con las normas reglamentarias vigentes y con los criterios de competencia de ese centro docente.

■ Aunque el Reglamento General dispone que una apelación no tiene efecto suspensivo, "[e]xcepto que la autoridad revisora determine lo contrario",[8] el órgano apelativo correspondiente deberá considerar —en el fino balance de conveniencias y perjuicios— la posibilidad de concederle al recurrente un remedio provisional en el procedimiento administrativo. De esta manera podrá permanecer en su empleo hasta que las autoridades pertinentes rindan una decisión final en el asunto.

---

[8] "Sección 50.8.3 — Derecho a solicitar revisión

"Una vez notificada de la terminación de su nombramiento probatorio sin concesión de permanencia, la persona afectada podrá, dentro de los treinta (30) días siguientes a la fecha de notificación, solicitar por los canales correspondientes la revisión de su caso. Excepto que la autoridad revisora determine lo contrario, la acción dando por terminado el nombramiento continuará en efecto mientras se tramita la revisión." Reglamento General, *supra*, Sec. 50.8.3.

Véase, también, la Sec. 6.20 del Reglamento sobre Procedimientos Apelativos Administrativos.

Por las razones anteriormente expuestas, *se revoca la sentencia del Tribunal Superior y se devuelve el caso a la Universidad de Puerto Rico para la continuación, de así solicitarlo el recurrente, del trámite apelativo interno.*

El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Ortiz se inhibió.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

"... [L]as formas de la justicia son tan sólo la corteza o la envoltura del derecho. Rota esa corteza, hallamos solamente hombres, cosas y profundos anhelos de vida. La justicia no es sólo un continente; por su interior corre la vida humana, entrañable y dramática, como que en ella se va decidiendo a cada instante el destino mismo del hombre.

"Para saber lo que vale la justicia es necesario entonces saber lo que vale el juez, en su íntima dimensión humana, en el sistema en que vive; si el hombre es libre en el mundo que lo rodea, la justicia está salvada; si no lo es, la justicia está irreparablemente perdida." E.J. Couture, *Estudios de Derecho Procesal Civil*, 2da ed., Buenos Aires, Ed. Depalma, 1978, Vol. I, pág. 156. Bajo esta óptica, la más completa deferencia judicial hacia las autoridades universitarias no justifica que reclamos como el de autos sean ahogados en aras de un apego desmedido al cauce administrativo.

Por correcta y justa debe confirmarse la sentencia del Tribunal Superior, Sala de San Juan, que declaró con lugar la demanda de *injunction* y daños y perjuicios promovida por Ebenezer García Cabán y su esposa Milagros Alsina, contra la Universidad de Puerto Rico, el Colegio Regional de Cayey y los profesores José Luis Monserrate Vila, Luis Guillermo

Rodríguez, René A. Hernández, Castora Lozano, Pío López Martínez, Miguel Reckman y José González. Dicho dictamen decretó inválido el despido de García Cabán del Colegio Universitario de Cayey y determinó que la evaluación de su trabajo docente —utilizada para justificar dicha acción— estuvo viciada por prejuicios y animosidades ideológicas y personales, así como por conflictos económicos. Como consecuencia el tribunal ordenó su reinstalación a la plaza de Catedrático Auxiliar que ocupaba, con carácter probatorio, más el pago de los emolumentos no satisfechos. Ordenó una nueva evaluación y prohibió que en ésta participaran los profesores codemandados. Finalmente, determinó que los esposos García-Alsina sufrieron daños y angustias mentales valorados en $20,000.

A poco examinemos los hechos no contradichos establecidos ante el ilustrado foro de instancia, veremos que los mismos reflejan un reclamo constitucional sustancial y meritorio cuyo desagravio inmediato podría sólo ser remediado judicialmente. *Pedraza Rivera* v. *Collazo Collazo*, 108 D.P.R. 272 (1979); *Otero Martínez* v. *Gobernador*, 106 D.P.R. 552 (1977); *Pierson Mueller I* v. *Feijoó*, 106 D.P.R. 838 (1978).

La premisa cardinal en que descansa toda la opinión de este Tribunal no es correcta. No se trata de una simple discrepancia de enfoques filosóficos educativos entre el peticionario García Cabán y sus evaluadores. Por el contrario, la sentencia del foro de instancia está apuntalada en que la decisión de no renovar su contrato fue motivada por *prejuicios ideológicos, políticos y personales, así como por intereses económicos y profesionales en conflicto*, configurativos de un discrimen en su contra y en la inobservancia sustancial de importantes requisitos procesales establecidos reglamentariamente para lograr una evaluación objetiva y justa de su labor docente.

Con esmerada escrupulosidad examinemos el trasfondo fáctico según depurados por el estrado de origen.

## II

Ebenezer García Cabán es profesor de carrera de vasta experiencia en labores pedagógicas. Comenzó el magisterio en el sistema de Instrucción Pública en 1968–1970. Durante los años académicos 1970–1972 fue profesor de Humanidades en el Colegio Universitario de Cayey (C.U.C.), Universidad de Puerto Rico (U.P.R.). Allí conoció y tuvo serias diferencias personales —por motivos ideológicos y políticos— con los profesores Miguel Reckman y Castora Lozano Berrueso, quienes en unión al Prof. José González Barza formaban parte del Comité de Personal. Lo consideraban "incapacitado para enseñar y no simpatizaban con su método de enseñanza".

Luego de obtener su doctorado *Summa Cum Laude* en Salamanca, España, durante 1973–1979 ejerció la cátedra en el Colegio Universitario del Turabo. Tuvo diferencias con la administración. A final de esos seis (6) años le fue denegada la permanencia y no le fue renovado el contrato. El entonces Presidente de la U.P.R. sostuvo esa negativa. No prosperó una reclamación judicial que cuestionaba ambas decisiones.

Posteriormente, para los años 1979–1985 fue profesor de filosofía en el Colegio Regional de Guayama de la Universidad Interamericana.

Durante este mismo período, se desempeñó excelentemente como profesor de Humanidades en el Colegio Regional de Carolina de la U.P.R. Publicó varios artículos de filosofía en revistas académicas y algunas columnas de carácter político. Presentó y fue aceptada una propuesta al *National Endowment for the Humanities*, en calidad de proyecto de investigación. La propuesta trataba sobre el sistema pedagógico utilizado en los colegios tecnológicos para la ense-

ñanza de las Humanidades. Proponía el establecimiento de métodos alternos y sugería que se estudiara la capacidad, motivación y actitudes de los profesores. Esta sugerencia produjo una gran hostilidad entre el Director-Decano del Colegio, el Director del Departamento de Humanidades y los miembros del Comité de Personal de Evaluación. Éstos entendían que a García Cabán no le correspondía cuestionar los métodos de enseñanza. Para el año 1982–1983, el Comité de Personal de Evaluación, el Director, la Decana de Asuntos Académicos y el Director-Decano del Colegio Regional no recomendaron la renovación del contrato. Repetimos, estas recomendaciones negativas no se debieron a su labor académica. Sobre este extremo las evaluaciones fueron buenas. La recomendación negativa fue producto de las pobres relaciones de García Cabán con el personal docente y administrativo de la institución. Según el tribunal a quo, "había un malestar general en el Colegio con la presencia del demandante porque éste era una persona controversial". Aun así, el Rector de los Colegios Regionales optó por renovarlo en dicho colegio.

Subsiguientemente, García Cabán se valió de su afiliación e influencias políticas dentro del Partido Nuevo Progresista y logró que la Oficina del Presidente de la U.P.R. asignara los fondos para la creación de una nueva plaza en el Colegio Universitario de Cayey. Dicha plaza, año académico 1983–1984, le fue conferida en septiembre de 1983, después de haber comenzado dicho año académico y que no se le renovara el contrato en el Colegio Regional de Carolina.

Contrario a la práctica establecida, el Comité del Departamento de Humanidades de Cayey no fue consultado al extenderse este nombramiento. Según antes expuesto, dicho comité opinaba que García Cabán no estaba capacitado para enseñar y discrepaban de su método de enseñanza.

Durante el primer semestre del año académico 1983–1984 la labor del profesor García Cabán consistió en ¾ partes de tarea administrativa y ¼ parte a la labor docente. Su super-

visor inmediato estaba conforme y satisfecho con su labor administrativa.

Las guías del Colegio Regional de Cayey para evaluar la labor de los profesores eran las Secs. 49.3(1) y 70.1.4 del Reglamento General de la U.P.R., y unas internas denominadas *Normas para la Evaluación de la Visita al Salón de Clases*, y como parte de éstas, unas *Instrucciones* al formulario titulado *Habilidad del Profesor en la Docencia*.

García Cabán fue evaluado para determinar si se le renovaba su contrato. Excepto en las visitas a clases, en todos los demás renglones de evaluación obtuvo resultados *excelentes*.

Conforme el tribunal de instancia, durante el proceso evaluativo se incurrieron en defectos procesales sustanciales y serias inobservancias reglamentarias. A tal efecto, de todos los factores enumerados en la Sec. 49.3, sólo se tomó en consideración la calidad de la enseñanza. Bajo éstos, el análisis estuvo prejuiciado por las opiniones que de antemano

---

(1) La Sec. 49.3 dispone:

"En las evaluaciones de la ejecutoria de los miembros del personal docente para los distintos fines, se tomarán en cuenta los factores siguientes:

"Sección 49.3.1 — Calidad de la enseñanza, la investigación o la divulgación.

"Sección 49.3.2 — Dedicación a las labores y al servicio universitario.

"Sección 49.3.3 — Cumplimiento de los deberes docentes.

"Sección 49.3.4 — Mejoramiento profesional.

"Sección 49.3.5 — Cooperación en los trabajos de la facultad, incluyendo comités y programas de estudios.

"Sección 49.3.6 — Trabajos de investigación y creación realizados.

"Sección 49.3.7 — Conferencias sobre materias propias de su campo.

"Sección 49.3.8 — Publicaciones, exposiciones, conciertos y otras actividades análogas.

"Sección 49.3.9 — Reconocimientos recibidos.

"Sección 49.3.10 — Opiniones fundamentadas y sustanciadas de sus compañeros y otras personas relacionadas con su trabajo.

"Sección 49.3.11 — Actitud profesional: disposición del profesor para participar en actividades profesionales; su equidad, tacto, sensatez, discreción y objetividad en el manejo de las situaciones en que participa; cooperación espontánea con la unidad a que sirva y con la instrucción en general."

poseían los evaluadores.(²) Tampoco se tomó en considera-
ción, conforme la Sec. 70.1 del Reglamento General de la
U.P.R., el tiempo desempeñado en tareas administrativas.
Más aún, las normas para la evaluación de la visita al salón
de clases fueron circunvaladas en los extremos siguientes:
(a) los miembros del Comité Departamental no discutieron
con el profesor García Cabán los ítem contenidos en el for-
mulario *Habilidad del Profesor en la Docencia*; (b) el in-
forme del Comité Departamental no incluyó: (1) obser-
vaciones sobre la adecuación del plan propuesto para la clase
y la realización de la misma; (2) juicio sobre la calidad de las
evaluaciones suministradas y del material auxiliar usado en
el curso: texto, notas, asignaciones, etc., y señalamiento de
los puntos débiles y fuertes del profesor evaluado, y sus va-
riaciones respecto a evaluaciones anteriores.

Además, se prescindió de un informe narrativo del De-
partamento que resumía los informes anteriores, el cual de-
bió ser elaborado por el Director en unión a los miembros del
Comité Departamental. Tampoco se incluyó un resumen de
las evaluaciones de los estudiantes, entre ellas las hojas de
evaluación. Al respecto, la evaluación consistió en una visita

---

(²) El tribunal concluyó:

"Sobre este extremo el Dr. Miguel Reckman declaró en la vista del [*injunc-
tion*] preliminar que antes de hacer la evaluación del demandante *ya tenía una
mente hecha de que no era apto para enseñar, que con la evaluación o sin ella lo
hubiera rechazado*; que *fue* a la clase *a ver si él había cambiado*; que le parece
que una *sola visita* a clases *es* demasiado *poco*; que recomienda dos visitas. En la
vista del [*injunction*] permanente declaró que el reglamento de evaluación tenía
que mejorarse incorporando dos visitas y otros aspectos tales como reunirse con
el profesor, visitar su casa para ver si tiene biblioteca, maquinilla, etc.

"Por otro lado, el Dr. José González Barja declaró que *previo* a la evaluación
del demandante *tenía un juicio* sobre su persona y sobre la docencia que *no le
favorecían*; que había un *juicio negativo* de los profesores sobre la personalidad
y competencia del demandante.

"La Dra. Castora Lozano declaró en la vista del [*injunction*] permanente
que el demandante era una persona *anodina y un profesor malo*. En la deposi-
ción que se le tomara manifestó que era una persona alterada y le causaba de-
sagrado." (Énfasis suplido.) Sentencia del Tribunal Superior de 3 de enero de
1986, págs. 10–11.

al salón de clases de aproximadamente 50 minutos. Durante ese tiempo, la profesora Castora Lozano a nombre del Comité Departamental entregó a los estudiantes del profesor García Cabán un formulario para que ellos evaluaran la clase. La evaluación se extendió por 15 minutos.

El Dr. José González Barja, Director del Departamento de Humanidades, emitió un informe expositivo de la evaluación de García Cabán y concluyó que no había sido bien aceptado por los profesores del Departamento. A su juicio no sería "sabio" retenerlo. Sin embargo, en el final de la evaluación del Comité Departamental, evaluó su labor docente como regular.

El Informe Narrativo del Comité Departamental, integrado por los profesores Castora Lozano, Miguel Reckman y Pío López Martínez, evaluó *deficiente* la clase. Las evaluaciones de los estudiantes fueron clasificadas por el Comité Departamental como buenas.

Al igual que otros, antes de su evaluación, el Director del Departamento de Humanidades también tenía una imagen negativa del profesor García Cabán. Éste es partidario del pensamiento pragmático, corriente rechazada enérgicamente por los profesores González Barja, Pío López y Miguel Reckman.

El foro de instancia determinó que la revisión del Comité Institucional de la Facultad fue "superficial e inadecuada". No se emitieron los criterios de evaluación utilizados, como tampoco si se había cumplido con las normas promulgadas. Esta falla se extendió a través de todo el proceso consultivo y apelativo del sistema universitario.

El Informe de Evaluación del Comité Departamental de Personal . . . suscrito por los Profesores José González Barja, Pío López, Miguel Reckman y Castora Lozano Berrueso refleja la siguiente puntuación:

|  | *Puntuación* | *Labor Docente* |
|---|---|---|
| Director del Depto. | 206 | Regular |
| Comité Departamental | 122 | Deficiente |
| Eval. Estudiantes | 323 | Buena |

Sentencia del Tribunal Superior de 3 de enero de 1986, pág. 14.

García Cabán comunicó su desacuerdo e indignación con tales evaluaciones. El 14 de diciembre de 1983 fue notificado por el Director del Departamento que no se le renovaría su nombramiento. Apeló al Presidente de la U.P.R. y el caso fue devuelto al Rector. Le solicitó a éste remedio interlocutorio. Le fue denegado. Acudió al tribunal.

## III

La revisión judicial de actuaciones de organismos educativos, aunque limitada, procede ante violaciones directas de derechos constitucionales o cuando son patentemente arbitrarias o carecen de base racional. Ello presupone cautela y prudencia desde el estrado. Después de todo, los jueces no contamos con la información ni el peritaje para revisar decisiones sobre evaluaciones de personal docente. Sin embargo, la discreción institucional universitaria sobre asuntos académicos y administrativos no excluye totalmente el escrutinio judicial. Véanse: *Vicéns* v. *U.P.R.*, 117 D.P.R. 771 (1986); *Jorge* v. *Universidad Interamericana*, 109 D.P.R. 505, 512 (1980). Así, sin asumir el papel de una superjunta de permanencia o sustituir criterios de destreza administrativa, los tribunales pueden explorar si la concesión o denegación de un contrato a un profesor al concluir su período probatorio, está sostenida por una base racional y apoyada en evidencia sustancial o si ha mediado arbitrariedad, discrimen o violación a derechos constitucionales. *Green* v. *Board of Regents of Texas Tech. University*, 355 F. Supp. 249 (1979); *Lieberman* v. *Gant*, 474 F. Supp. 848 (1979); *Powell* v. *Syracuse University*, 580 F.2d 1150 (1978).

La tarea exige un esforzado celo judicial en casos de profesores sin tenencia. De ordinario éstos están sujetos a mayores presiones. Como correctamente consignó la ilustrada sala sentenciadora:

> A pesar de que las decisiones sobre tenencia o evaluación de profesores suscitan problemas delicados y difíciles en cualquier sistema educativo, esto no es óbice para que no se establezcan linderos a la discreción administrativa. Sobre este particular, los tribunales son muy cuidadosos en distinguir entre aquellas cuestiones que están revestidas de un gran interés judicial, poniendo particular interés en el cumplimiento del debido proceso de ley, de aquellas zonas reservadas al peritaje y discreción administrativa.
>
> El profesor joven puede tener ideas innovadoras y cierta agresividad que pueden ser frustradas por una administración hostil, si no tiene alguna protección. Aunque las ideas del maestro joven sean erróneas y su agresividad objetable, su interés debe recibir alguna protección contra acciones arbitrarias o caprichosas de aquellos que vienen obligados a evaluarlos.
>
> Para evitar la arbitrariedad y el capricho deben existir buenas normas en las cuales basar las decisiones sobre retención y permanencia. Mientras más laxo sea el procedimiento y más funestas las consecuencias sobre el profesor mayor será el escrutinio judicial.
>
> Por último, si la decisión se basa en razones que rebasan la docencia, las autoridades educativas pueden situarse fuera de la zona de peritaje y su decisión no merecer la deferencia judicial. Sentencia del Tribunal Superior de 3 de enero de 1986, págs. 23–24.

Al confrontar estos principios doctrinarios al caso de autos, el análisis objetivo de la prueba demuestra que la evaluación del profesor García Cabán trascendió los límites permisibles en las dimensiones pedagógicas y docentes. Sin lugar a dudas estuvo inmersa en un mar de profundos prejuicios y personalismos. La intensidad de la lesión a sus derechos supera el trámite administrativo. Que estuviera en un

período probatorio no es impedimento para extenderle las garantías constitucionales y estatutarias. Todo lo contrario. Patentiza la necesidad de intervención judicial. Precisamente, era éste el último año crucial para después obtener permanencia. Ante el antagonismo de los miembros del Comité, García Cabán nunca tuvo la menor oportunidad de ser evaluado objetivamente. Se violó lastimosamente el espíritu de la reglamentación universitaria vigente. Curiosamente, sólo los estudiantes, ajenos a las pasiones y recelos de algunos miembros de la facultad, lo evaluaron con ecuanimidad.

En buena juridicidad, si nos atenemos a este cuadro fáctico, difícilmente puede sostenerse un decreto de abstención judicial basado en las normas de agotamiento de remedios administrativos o de jurisdicción primaria. En el mundo académico e intelectual universitario, García Cabán no tuvo la más mínima oportunidad de ser evaluado imparcialmente. Ello resulta no sólo injusto, sino paradójico. "El intelectual ha de ser un enamorado de la verdad. Sin actitudes pilatescas, ha de buscar la verdad, tratar de encontrarla y de que triunfe: descubrir lo que las cosas son tras la costra que las cubre por los prejuicios humanos, es la tarea básica del filósofo en su relación con la verdad (ORTEGA). Y es la del jurista empeñado en interpretar y aplicar debidamente la norma jurídica." V.M. Garrido de Palma, *Derecho Civil y Metodología Jurídica*, 259 Rev. Gen. Leg. y Jur. 455, 472 (1985). Disentimos. Confirmaríamos al foro de origen.