CONSEJO DE EDUCACIÓN SUPERIOR DE LA UNIVERSIDAD DE PUERTO RICO Y OTROS, demandantes y apelantes, *v.* HON. PEDRO ROSSELLÓ GONZÁLEZ, GOBERNADOR DE PUERTO RICO, demandado y apelado.

*Número:* AC-93-426            *Resuelto:* 24 de septiembre de 1993

*Lino J. Saldaña* y *Pedro Juan Pérez Nieves*, de *Saldaña, Rey & Alvarado*, abogados de los apelantes; *Daniel R. Domínguez, Jorge C. Pizarro* y *Marie E. López Adames*, de *Domínguez & Totti*, abogados de los apelados; *Pedro A. Delgado Hernández*, *Procurador General*; *Rubén T. Nigaglioni, Jorge A. Antongiorgi* y *Julio Nigaglioni Arrache*, de *Ledesma, Palou & Miranda*, abogados de la Universidad de Puerto Rico; *José de la Cruz Skerrett*, abogado de la *amicus curiae*, la Asociación de Colegios y Universidades Privadas (A.C.U.P.); *Rafael L. Martínez Torres* y *Carlos Santiago Torres*, abogados del nuevo Consejo de Educación Superior.

## RESOLUCIÓN

Por plantear el recurso una cuestión constitucional sustancial y novedosa —de vital importancia pública— el Tribunal acoge el recurso presente para así brindarle a las partes una oportunidad de exponer, con mayor detalle, sus respectivas posiciones. Este trámite del Tribunal no prejuzga el asunto.

Debido a su importancia, el Tribunal le dará consideración prioritaria para su adjudicación más pronta.

Lo acordó el Tribunal y certifica la señora Subsecretaria General. El Juez Presidente Señor Andréu García emitió un voto particular. Los Jueces Asociados Señor Negrón García y Señor Rebollo López emitieron votos disidentes.

(*Fdo.*) Carmen E. Cruz Rivera
*Subsecretaria General*

## – O –

Voto disidente del Juez Asociado Señor Negrón García.

"Hacer fácil lo que es difícil constituye una falsificación peor que otras, aunque se perpetre en nombre de la pedagogía (falsa). Y, como ha dicho Alvaro D'Ors, es más formativo aprender una cosa difícil que cien fáciles." A. de la Oliva Santos y M.A. Hernández, *Lecciones de Derecho Procesal*, 2da ed., Barcelona, Ed. Promociones Pubs. Universitarias, 1984, Vol. I (Nota Introductoria). Discrepamos del trámite y decisión adoptada por la mayoría del Tribunal. Distinto a la brevedad posible, confirmaríamos el dictamen del Tribunal Superior, Sala de San Juan (Hon. Gilberto Gierbolini, Juez).

### I

Con la aprobación de la Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601 *et seq.*), se estableció el Consejo de Educación Superior (en adelante el Consejo) como nuevo organismo de gobierno de la Universidad de Puerto Rico (en adelante U.P.R.). Éste es integrado por ocho (8) miembros, todos nombrados por el Gobernador con el consejo y consentimiento del Senado de Puerto Rico. 18 L.P.R.A. sec. 602(b)(1). Naturalmente, todos los puestos disponibles a raíz de la Ley Núm. 1, *supra*, fueron ocupados por personas seleccionadas por el Gobernador en ese momento.[1] El Consejo tenía la función *dual*

---

[1] Hasta entonces el organismo rector de la Universidad de Puerto Rico (en adelante U.P.R.) era el *Consejo Superior de Enseñanza* integrado por su Presidente, el Secretario de Instrucción Pública y seis (6) ciudadanos, dos (2) de ellos educadores prominentes, nombrados por diez (10) años por el Gobernador con el consejo y consentimiento del Senado. Véase Ley Núm. 135 de 7 de mayo de 1942, según enmendada, 18 L.P.R.A. secs. 631–636 y 638–658.

De conformidad con esa nueva Ley Núm. 1 (18 L.P.R.A. sec. 601 *et seq.*), estas personas pasaron a formar parte del Consejo de Educación Superior (en adelante Consejo). *De esta manera se produjeron dos (2) nominaciones, además de las surgidas a raíz de la terminación del nombramiento de algunos miembros del antiguo Consejo.*

de administrar la U.P.R. y, además, licenciar y acreditar las instituciones privadas de educación superior que se sometieran *voluntariamente*. Este proceso de licenciamiento y acreditación advino de forma *obligatoria* con la aprobación de la Ley Núm. 31 de 10 de mayo de 1976 (18 L.P.R.A. sec. 2101 *et seq.*). *Este binomio funcional fue objeto de serias críticas por varios sectores fundamentados en su potencial conflicto de intereses.*

Así las cosas, la Asamblea Legislativa aprobó la Ley Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y la Ley Núm. 16 de junio de 1993 (18 L.P.R.A. sec. 602) y la Ley Núm. 17 de la misma fecha, 18 L.P.R.A. secs. 852–852l, 2101. La Ley Núm. 16, *supra*, creó un *nuevo* cuerpo rector de la U.P.R. —la Junta de Síndicos de la U.P.R.— a la cual le traspasó los poderes y las facultades que poseía en esa capacidad el Consejo. Los propósitos de esta medida, según su exposición de motivos, fueron bifurcar las funciones del organismo rector de la U.P.R. y del cuerpo acreditador de las instituciones privadas de educación superior, para así superar la posibilidad de cualquier conflicto de interés. Se quiso crear, además, un ente "que pueda dedicar todo su tiempo y esfuerzo a servir como cuerpo rector de la Universidad y que tenga representación de miembros de la comunidad universitaria". 1993 (Parte 1) Leyes de Puerto Rico 50, 51. La Ley Núm. 12, *supra*, complementó este traspaso de funciones al designar a la Junta de Síndicos como el órgano con la facultad para establecer los procedimientos correspondientes para solicitar, recibir, custodiar y administrar los fondos de la U.P.R.

Finalmente, la Ley Núm. 17, *supra*, puso *fin* a la dualidad de funciones del Consejo al asignarle *exclusivamente* la función de licenciar y acreditar las instituciones privadas de educación superior.

Al día siguiente de haberse aprobado estas leyes, el 17 de junio, Awilda Aponte Roque y los demás miembros del Consejo (excepto el Secretario de Educación) —en su carác-

ter institucional y personal— solicitaron([2]) al Tribunal Superior, Sala de San Juan, un *injunction* preliminar y permanente y un decreto de inconstitucionalidad. El 21 de junio de 1993 dicho foro celebró una vista para considerar la solicitud de entredicho provisional e *injunction* preliminar. Al otro día, 22 de junio, denegó esta solicitud. Posteriormente, luego de varios trámites procesales,([3]) el 5 de agosto el tribunal de instancia dictó sentencia declarando *sin lugar* la demanda. Contra ese dictamen se presentó un escrito de apelación el 20 de agosto de 1993 y, simultáneamente, una moción en auxilio de jurisdicción. *La Sala de Verano acordó referirlo al Pleno.*

Los peticionarios Awilda Aponte Roque, *et al.*, señalan ocho (8) errores, entendiendo que estos involucran cuestiones constitucionales sustanciales que ameritan que su escrito sea acogido como una apelación. Son susceptibles de agruparse en tres (3) predicados: *primero*, la naturaleza y estirpe jurídica de la autonomía universitaria y la libertad académica institucional; *segundo*, la legitimación activa del Consejo frente a las acciones del Gobierno, y *tercero*, si como resultado de la aprobación de estas leyes sus miembros fueron destituidos y de haberlo sido fue ilegal.([4])

---

([2]) Partimos de la premisa de que los peticionarios poseen legitimación activa de carácter personal y que sus reclamos son inseparables del Consejo como institución.

([3]) De esta resolución solicitaron reconsideración sin éxito. Posteriormente acudieron a este Foro y proveímos un no ha lugar.

([4]) Argumentan y elevan a rango de derecho constitucional la autonomía universitaria bajo las libertades garantizadas por la Primera y Decimocuarta Enmiendas de la Constitución federal y por las Secs. 4 y 6 del Art. II, Const. E.L.A., L.P.R.A., Tomo 1, y bajo el derecho fundamental a la educación garantizado por el Art. II, Sec. 5, Const. E.L.A., L.P.R.A., Tomo 1, resolver que las Leyes Núms. 16 (18 L.P.R.A. sec. 602), 17 (18 L.P.R.A. secs. 852–852l, 2101) y 12 (18 L.P.R.A. sec. 621c) no inciden sobre el derecho constitucional a la libertad académica institucional y a la autonomía de la Universidad de Puerto Rico (en adelante la Universidad); adjudicar que la Universidad, representada por el Consejo de Educación Superior carece de legitimación activa para demandar al Gobernador en defensa de su derecho a la libertad académica institucional y autonomía; decidir que al Consejo y sus miembros no les ampara el derecho a la libertad académica institucional porque las funciones del Consejo son administrativas y no académicas y no toman decisiones académicas sino puramente administrativas; decidir que los miembros del Consejo no fueron destituidos de sus cargos como junta de gobierno de la Universidad, y que la destitución no se debió a motivaciones políticas.

## II

El Art. II, Sec. 5 de la Carta de Derechos, Const. E.L.A., L.P.R.A ., Tomo 1, ed.1982, pág. 271, proclama que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y las libertades fundamentales". En este precepto detectamos inmerso, como elemento indispensable para su consecución, la libertad académica o de cátedra apuntalada en el clima. que debe prevalecer en toda democracia. Complemento de lo anterior, tenemos el derecho a la libertad de expresión y asociación establecido en el Art. II, Sec. 4 de la Const. E.L.A., L.P.R.A., Tomo 1. No olvidamos —y en nuestros disensos así la hemos defendido— la libertad de cátedra, *García Cabán v. U.P.R.*, 120 D.P.R. 167, 185 (1987), y el principio de que la educación universitaria "se efectúa en un ámbito de intercambio de ideas, de contradicciones, de examen a fondo del conocimiento con el propósito de desarrollar un sentido crítico. Se le ofrecen [al inventario] diversas perspectivas que deberán pesar en su búsqueda de la verdad. ... El universitario ha de desarrollar, con la ayuda del maestro, el convencimiento de que el aprendizaje es obra de la voluntad personal y del empeño particular del individuo. *La universidad, por lo tanto, debe estar abierta a los aires de extramuros, al fluir incesante de ideas y opiniones que expongan al estudiante a ese mundo complejo y conflictivo del conocimiento". (Énfasis suplido.) De Paz Lisk v. Aponte Roque,* 124 D.P.R. 472, 502 (1989), opinión disidente.

*Ahora bien, en recta juridicidad, difícilmente en este caso puede sostenerse un decreto de inconstitucionalidad fundamentado en loas a la autonomía universitaria y libertad de cátedra, corolarios del derecho de expresión y asociación.* No podemos tomar la autonomía universitaria y la libertad académica dogmáticamente, como artículos de fe, ni sobrecargarlos conceptualmente con una densidad ju-

rídica doctrinal que no poseen. Hacerlo desbordaría el ámbito de revisión judicial. *Autonomía universitaria no significa una isla institucional al margen de los otros poderes del Gobierno.*

Sin menoscabo de un análisis ulterior, basta señalar —con todo respeto— que la mayoría pretende *construir artificialmente un castillo jurídico en arena movediza, e intervenir inintencionalmente en unos procesos y fuerzas político-partidistas que, independientemente de que sean o no de nuestro agrado, nos están vedados pues tienen su propio campo de acción en los poderes Ejecutivo y Legislativo del Gobierno.*

La actuación mayoritaria pasa por alto que no nos corresponde juzgar la sabiduría e idoneidad de un esquema legislativo si no vulnera la Constitución. De repente, parece olvidado que la dirección y el gobierno corresponde a las dos (2) ramas políticas y que, en palabras recientes del Juez Asociado Señor Fuster Berlingeri, "[s]i hay o no razones prácticas o *de política pública* para mantener las estructuras actuales [del Consejo] o cambiarlas ·es *cuestión que le toca decidir primordialmente a las ramas políticas del Gobierno*". (Énfasis suplido.) *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521 (1993).

## III

En buena metodología apelativa-adjudicativa, la determinación inicial de la existencia o no de una cuestión constitucional sustancial depende de que se demuestre que tal reclamo *aduzca hechos* que razonablemente permitan concluir que efectivamente se han infringido intereses constitucionales protegidos y susceptibles de un remedio judicial. Sólo entonces cabe evaluar si tales intereses son sustanciales y si hay ausencia de justificación razonable que avale las acciones del Estado. Hemos dicho al respecto que "no existe tal cuestión [constitucional sustancial] si un examen

del planteamiento invocado refleja la presencia de un error, que tiende a involucrar un argumento constitucional *inexistente*". (Énfasis suplido.) *Com. Asuntos de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720 (1980). Véase, además, *Calderón, Rosa-Silva & Vargas v. García*, 120 D.P.R. 803, 809–812 (1988).

Un estudio sosegado y minucioso de los autos nos ha convencido que no se ha demostrado esa sustancialidad y de que se hayan vulnerado realmente los derechos constitucionales. *A menos que la mayoría desee reescribir nuestra Constitución y establecer un nuevo prontuario y guías en torno a la dinámica político-partidista del país, no vemos cómo pueda anularse este nuevo diseño legislativo.*

Ciertamente —no es objeto de argumentación seria— que la Legislatura actuó, dentro del ámbito de su autoridad, en la aprobación de estas leyes al crear la Junta de Síndicos de la U.P.R. como un nuevo departamento ejecutivo y modificar las funciones de otro (el Consejo). Tal facultad le fue conferida *expresamente* en nuestra Constitución:

La Asamblea Legislativa tendrá facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. Art. III, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 343.

La Exposición de Motivos de la Ley Núm. 16 señala:

La Universidad de Puerto Rico es gobernada al presente por el Consejo de Educación Superior que funge a la vez como Junta de Gobierno de la Universidad de Puerto Rico y como ente que licencia y acredita otras instituciones de educación superior y sus programas. Esta función dual del Consejo de Educación Superior no sólo ha impedido que el Consejo actual pueda dedicar todo su tiempo y esfuerzo a servir como cuerpo rector de la Universidad, *sino que ha colocado al cuerpo y sus miembros en una situación de posible conflicto de intereses lo que ha sido señalado en diversas ocasiones por distintos grupos, entidades académicas, y ciudadanos particulares.*
A los fines de que la Universidad de Puerto Rico cuente con un cuerpo rector dedicado exclusivamente a gobernar la Uni-

versidad de Puerto Rico en el cual el interés público esté representado por ciudadanos distinguidos y tenga además una representación de los miembros de la comunidad universitaria, se crea la Junta de Síndicos de la Universidad de Puerto Rico para gobernar y administrar el sistema universitario del estado. (Énfasis suplido.) 1993 (Parte 1) Leyes de Puerto Rico 50–51.

Por su parte, la Ley Núm. 17, *supra*, dispuso:

Con el transcurrir del tiempo, se ha reclamado, dentro y fuera de la Universidad de Puerto Rico, la necesidad de separar las dos funciones que, por mandato de ley, ejerce el Consejo de Educación Superior. Abonan a ese reclamo los siguientes factores: la creciente complejidad del Sistema Universitario Público que requiere una mayor atención de su cuerpo de gobierno; el acelerado desarrollo de las Instituciones Privadas de Educación Superior y su notable multiplicación; y las exigencias federales referentes a la financiación de programas universitarios.

Esta Ley tiene como propósito separar las funciones de licenciar y acreditar instituciones universitarias privadas y las funciones correspondientes al gobierno de la Universidad del Estado. Para ello se crea el Consejo de Educación Superior. 1993 (Parte 1) Leyes de Puerto Rico 57.

No se ha aportado evidencia suficiente para poner a este Tribunal en la posición de cuestionar la legitimidad de los propósitos de esta legislación. Todo lo contrario, según el ilustrado foro de instancia sentenció, obran en autos numerosas comunicaciones y ponencias —de la Asociación de Colegios y Universidades Privadas en Puerto Rico, de la Comisión de Educación de la *Middle States Association* e, incluso, del entonces Presidente del Consejo, Doctor Padró Yumet— expositivas del conflicto de interés aludido. En la Asamblea Legislativa del cuatrienio pasado (1988–1992), se presentaron dos (2) proyectos para deslindar ambas funciones.

Más aún, en el plano de la campaña electoral, los candidatos a gobernación por el Partido Popular Democrático (P.P.D.) y el Partido Nuevo Progresista (P.N.P.) prometieron que el Consejo cesaría de licenciar programas universitarios privados.

Aun así, los peticionarios Awilda Aponte Roque *et al.*, aducen un discrimen político apuntalado en que, a raiz de las elecciones, el Gobernador electo doctor Rosselló González conminó a todos los miembros del Consejo, Presidente U.P.R., rectores y decanos a que renunciaran, y que se crearía una nueva Junta de Síndicos para regir los destinos universitarios.

La naturaleza de nuestra función revisora de la Constitución impide, ante una declaración clara y legítima de propósitos de la Asamblea Legislativa —apoyado por un amplio historial legislativo— *que emprendamos a destiempo, con una lámpara vacía de quinqué, una búsqueda de motivos obscuros o escondidos fundados en tales aseveraciones.*(5) Nuevamente, parece olvidado que la *"política pública y la intención legislativa se investigan en los trámites, debates, informes y finalmente en los textos culminantes de los estatutos"*. (Énfasis suplido.) *Pueblo v. González Malavé*, 116 D.P.R. 578, 586 (1985).

## IV

Ni el reclamo de autonomía universitaria ni tampoco la libertad de cátedra están lesionados en este caso o respaldados por una prueba que justifique la intervención de este Tribunal. Un análisis de las facultades conferidas a la nueva Junta de Síndicos de la U.P.R. no revela amenazas *nuevas*, per se, a la autonomía universitaria, pues simplemente las facultades que tenía el Consejo han sido transferidas a esa Junta. Si algo reflejan los autos es que estamos ante un planteamiento prematuro y conceptual *que la mayoría del Tribunal no debe adjudicar a destiempo.* Hacerlo es enterrar de un plumazo las normas de abstención

---

(5) *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193 (1988); *Kassel v. Consolidated Freighways Corp.*, 450 U.S. 662 (1981); *Weinberger v. Weisenfeld*, 420 U.S. 636, 648 esc. 16 (1975); *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

hace unos días reconocidas: "[e]ste Tribunal tiene el deber, reiterado y cumplido en repetidas ocasiones, de no decidir a destiempo cuestiones constitucionales y así evitar pronunciamientos de índole consultiva, *sin proporción a los hechos.* Véanse, *e.q.: Hernández Agosto v. Betancourt,* 118 D.P.R. 79, 86–87 (1986); *Molina v. C.R.U.V.,* 114 D.P.R. 295, 297 (1983); *Cerame-Vivas v. Srio. de Salud,* 99 D.P.R. 45, 51 (1970); *Esso Standard Oil v. A.P.P.R.,* 95 D.P.R. 772, 783 (1968)." (Énfasis suplido.) *Caquías v. Asoc. Res. Mansiones Río Piedras,* 134 D.P.R. 181, 188 (1993).

Por otro lado, la composición de la nueva Junta de Síndicos de la U.P.R. tampoco presenta, de su faz, defectos constitucionales o infracción a la libertad de cátedra. Se argumenta el hecho de que los nombramientos del Consejo se hacen de forma escalonada para impedir que éste se encuentre a merced de los cambios de gobierno. Es un dato histórico, de fácil comprobación, que la Ley Núm. 135 de 1942 (18 L.P.R.A. secs. 631–636 y 638–658) la cual creó el Consejo Superior de Enseñanza, y la Ley Núm. 1, *supra,* la cual derogó a aquél y estableció el *Consejo,* aumentaron su composición, lo cual unido a las vacantes existentes *siempre* ha permitido que los gobernadores incumbentes puedan nombrar personas de su *predilección.* Obviamente, el elemento político partidista estuvo presente en ese proceso de selección y viabilizó un control institucional. Ante esta realidad, más allá del papel legal, ¿cómo pueden entonces los peticionarios Awilda Aponte Roque *et al.* argumentar que la fórmula de escalonamiento en los términos de la Ley Núm. 1, *supra,* "dio plena vigencia a los postulados de autonomía y libertad académica"?

Naturalmente, los puestos creados por la nueva ley son inicialmente ocupados por las personas que nombre el Gobernador.[6] Ello no la invalida, pues es *incidental* a su aprobación. *No crea una situación distinta a las leyes an-*

---

[6] Excepto el representante estudiantil y los dos (2) profesores.

*tecesoras del Consejo*, ni se aparta a lo que de ordinario ocurre al crearse o ampliarse nuevas juntas o departamentos ejecutivos. Además, luego de estos primeros nombramientos, la ley reproduce la fórmula de que los subsiguientes se harán en forma escalonada. *Si antes fue bueno y constitucional, ¿por qué ahora no lo es?*

Este enfoque no es ad hoc. No puede divorciarse el clima universitario —libertad de asociación y expresión, esto es, los derechos civiles de los educadores, profesores y estudiantes— de los poderes de la Asamblea Legislativa. "Este es un asunto *que corresponde atender a la Asamblea Legislativa*, en cumplimiento de los *mandatos constitucionales*, para marcar los límites de la reglamentación intrauniversitaria. *No se trata de una cuestión que corresponda exclusivamente a la autonomía de la Universidad.*" (Énfasis suplido.) Informe Especial Sobre la Libertad Académica en la U.P.R, Comisión de Derechos Civiles, *Lino J. Saldaña*, Presidente, 15 de marzo de 1967, pág. 22.

Finalmente, se alega que la promulgación de estas medidas ha tenido el efecto de destituir ilegalmente a los miembros del Consejo. El argumento adolece del mismo defecto. ¿En qué consiste la destitución aludida? Ellos continúan siendo miembros del Consejo, no se han alterado las dietas que perciben ni el término por el cual fueron nombrados; sólo se han modificado algunas de sus funciones. Antes estaban a cargo de la acreditación y corrección de las licencias a Instituciones Privadas de Educación Superior y administrar la U.P.R. Las nuevas leyes le asignan sólo la primera de estas dos (2) funciones.

Curiosamente, los propios peticionarios, Awilda Aponte Roque *et al.*, implícitamente aceptan la facultad legislativa para efectuar estos cambios al argumentar, como alternativas menos drásticas, "*aumentar* el número de miembros del Consejo para dar representación a estudiantes —y profesores— y delegar en un nuevo cuerpo las funciones de supervisar las instituciones privadas". (Énfasis suplido.)

Moción en auxilio de jurisdicción, pág. 12. Esa argumentación derrota su tesis central. Si en lugar de separar las funciones, la Ley Núm. 16, *supra,* hubiese *duplicado* el número de miembros del Consejo —propiciando así una mayoría de nombramientos por el actual Poder Ejecutivo— ¿sería inconstitucional? *Obviamente no.* ¿Podemos entonces, *en abstracto,* forzar nuestra intervención para variar o anular el esquema legislativo? *¿Bajo qué misteriosa lógica la mayoría pretende sostener que los actuales concejales —nombrados por la anterior administración— están más capacitados e investidos de un don privilegiado para garantizar y velar la autonomía universitaria y la libertad académica?*

## V

*Teóricamente,* a través de las facultades de la Junta de Síndicos de la U.P.R. —*al igual que las anteriores que tenía el Consejo*— puede interferirse indebidamente con las áreas relacionadas con quién habrá de enseñar, qué se enseñará, cómo se enseñará y quién ha de ser admitido a estudiar en la U.P.R. Sin embargo, repetimos, sólo podemos enfrentarnos a situaciones concretas y reales. De ello ocurrir, *sin duda,* como en el pasado procederíamos a vindicar inmediatamente los derechos constitucionales de todos los afectados. *García Cabán v. U.P.R.,* supra.

*En ausencia de reclamo específico de un menoscabo real a los derechos constitucionales sustanciales,* hemos de superar la tentación de atender y entender cuestiones hipotéticas, abstractas o contingentes. Ello equivaldría a emitir una opinión consultiva. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico,* 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 116–119. *Nos convertiría en un super Gobierno usurpando funciones que no nos competen.*

En *resumen,* según enjuició el reputado tribunal de ins-

tancia, los peticionarios Awilda Aponte Roque *et al.*, como "miembros del CES desean continuar como hasta el presente o en la alternativa que se adopte la idea que otras personas han propuesto. Al día de hoy existe un enfoque distinto por el nuevo gobierno en funciones. No corresponde a este Tribunal entrar a la arena política para dirimir si tal o cual programa del nuevo gobierno es sabio o no. Ello es prerrogativa de las ramas políticas de nuestro gobierno (Ejecutiva y Legislativa)". Sentencia, pág. 27.

Ese deseo de los peticionarios Awilda Aponte Roque *et al.* no es suficiente. Ciertamente no hay interconexión o ligazón de causa o efecto en sus planteamientos. *Así aclarado, en el fondo, sólo estamos ante una tesis de origen político-partidista no susceptible de ser configurada como lesión constitucional legítima, que pretende únicamente controlar las estructuras prevalecientes y perpetuar incumbentes nombrados por una administración de un partido (Partido Popular Democrático) que perdió las elecciones.*

Sinceramente, ¿plantea esta apelación una cuestión constitucional sustancial?

Una nota final. Suscribimos totalmente las expresiones en torno a la independencia judicial expuesta por el Juez Presidente Señor Andréu García en su voto particular. Nuestro disenso responde al ejercicio extraído de esos valores. En cuanto a su peculiar apreciación de las razones que han movido a la mayoría a acoger esta apelación, nos remitimos a los fundamentos aquí expuestos.

## – O –

Voto disidente emitido por el Juez Asociado Señor Rebollo López.

La decisión de una mayoría de los integrantes de este Tribunal de darle curso al recurso de apelación radicado en el presente caso —alegadamente debido a que en el mismo

se "plantea ... una cuestión constitucional sustancial" (Resolución, pág. 1)— *constituye un ejemplo más de una serie de decisiones jurídicamente cuestionables emitidas en los últimos años por este Foro que lamentablemente han tenido el efecto de socavar la confianza que la ciudadanía necesariamente ha de tener en el más Alto Foro apelativo del País.*

En el presente caso, desafortunadamente, *el daño es aún mayor.* La decisión emitida no sólo tiene el efecto de erosionar, aún más, esa confianza *sino que se pone en grave riesgo, durante el tiempo que le tome a este Tribunal resolver el recurso, el buen funcionamiento, y estabilidad, de la única institución pública universitaria de nuestro País; ello con el consabido perjuicio a nuestra juventud.*(¹)

El recurso radicado es *obviamente* inmeritorio. Resulta *palpablemente* claro que una "criatura" del Estado, como lo es el Consejo Superior de Enseñanza (en adelante C.E.S.), *no* tiene "legitimación activa", *como institución,* para impugnar la validez constitucional, frente al Estado "su creador", de las Leyes Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y la Núm. 16 de 16 de junio del mismo año (18 L.P.R.A. sec. 602). La jurisprudencia federal y estatal citada por el C.E.S., en apoyo de su contención de que sí posee legitimación activa, es *completamente* distinguible e inaplicable.

Por otro lado, y ya específicamente en cuanto a los integrantes del referido Consejo en su capacidad individual, resulta *igualmente* obvio que, a pesar de que éstos *podrían* tener legitimación activa para radicar el pleito, *los derechos constitucionales de los referidos funcionarios no son afectados en forma alguna por la legislación en controversia.* Dicha legislación lo que, *meramente,* hace es

---

(¹) Aún más sorprendente resulta ser la posición asumida por tres (3) de los integrantes de este Tribunal a los efectos de que concederían la moción en auxilio de jurisdicción que radicaron los apelantes en el presente caso; esto es, que dejarían en suspenso la implantación de la legislación en controversia, devolviéndole el control y la dirección de la Universidad de Puerto Rico al Consejo de Educación Superior.

Afortunadamente, para Puerto Rico y nuestro ordenamiento jurídico, dicha posición no prevaleció.

transferir una (1) de las dos (2) funciones que hasta ahora había venido desempeñando el C.E.S. a la nueva Junta de Síndicos de la Universidad; acción por la que habían venido *clamando* muchos educadores en Puerto Rico. El hecho de que los miembros del C.E.S. *prefieran* desempeñar la función que fuera transferida a la nueva Junta *no* hace que la legislación sea inconstitucional. *Ello es una determinación de política pública, la que tiene derecho a hacer la Asamblea Legislativa de Puerto Rico, que está fuera del ámbito de la revisión judicial.* Nuevamente, la jurisprudencia que citan los apelantes en apoyo de su posición, es *claramente* distinguible e inaplicable.

Por último —y aun asumiendo a los fines de la argumentación que los apelantes, en su capacidad individual, efectivamente tienen "legitimación activa" para radicar el presente pleito— *tenemos que un examen objetivo y desapasionado de las leyes en controversia revela que las mismas, de su faz, no afectan en forma alguna ni la libertad de cátedra, ni el derecho a la libre expresión, ni ningún otro derecho constitucional; que nuestra Constitución le pueda garantizar a los miembros de la comunidad universitaria.* Por otro lado, la prueba señalada en la demanda radicada por la representación legal de los apelantes —con la que, alegadamente, éstos pueden demostrar que la aprobación de las mencionadas leyes obedeció, de manera principal, a motivaciones políticas partidistas— *es palpablemente insuficiente en derecho, aun cuando, como hizo el foro de instancia, se admitiera su certeza.* Dicha prueba, *únicamente*, puede ser considerada suficiente en derecho para demostrar ese hecho *por una mente interesada o prejuiciada.*

*En resumen*, nos enfrentamos ante una actuación legislativa legítima que es completamente constitucional y de *sencilla* interpretación, entendimiento y comprensión; lo cual hace que sea *verdaderamente difícil* de entender la acción tomada en el día de hoy por una mayoría de los integrantes del Tribunal. La determinación del Tribunal de

darle curso a una apelación *claramente* inmeritoria tendrá la lamentable consecuencia de —*no importa cuál sea la decisión que finalmente emita el Tribunal en relación con la misma*— causar una grave *incertidumbre e inestabilidad* en la Universidad de Puerto Rico; pudiendo tener la misma el efecto, inclusive, de cohibir a los miembros de la nueva Junta de Síndicos de ejercer las prerrogativas que válidamente le concede la nueva legislación, retardando ello el desarrollo institucional de la Universidad.

En su momento oportuno, ampliaremos y justificaremos *plenamente* las breves expresiones que hemos hecho en el día de hoy. Por lo pronto, y como hemos expresado en ocasiones anteriores: *la verdad puede ser dulce o amarga —inclusive severa—* pero nunca es ofensiva ni injusta*. En fin, la determinación sobre la legitimidad y corrección de las distintas posiciones asumidas por los integrantes del Tribunal en el presente caso la dejamos al juicio de la historia y a la inteligencia y sagacidad de nuestros conciudadanos.

$$- \, \mathbf{0} \, \text{-}$$

Voto particular del Juez Presidente Señor Andréu García.

Una mayoría de este Tribunal ha determinado que procede dar curso a la apelación presente. Al llegar a esa conclusión, la mayoría tuvo las disposiciones legales y reglamentarias como criterios rectores, así como otras normas desarrolladas en la jurisprudencia que gobiernan el ejercicio de nuestra discreción para atender esta clase de procedimientos. Con independencia de criterio —en forma educada y reflexiva— dispensando la consideración y respeto debidos a los criterios de otros miembros distinguidos de esta Curia y a los litigantes; profesando, al así hacerlo, la adhesión a los principios que dan vida a nuestra organización colectiva y, sobre todo, siguiendo la luz de la conciencia individual —que dicta a cada cual su particular visión de lo que es justo— esa mayoría llegó al convenci-

miento firme de que el recurso presente plantea una cuestión constitucional sustancial. Véanse: Ley Núm. 115 de 26 de junio de 1958 (4 L.P.R.A. secs. 35, 37); Regla 53 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Calderón, Rosa-Silva & Vargas v. García*, 120 D.P.R. 803 (1988).

Vivimos en un sistema de leyes, no de hombres. El poder viene de la ley, no a la inversa. El Ejecutivo y la Asamblea Legislativa tienen un campo de acción amplio para llevar a cabo sus programas, *pero no gozan de autoridad irrestricta para todo*. Esto es así porque en su sabiduría los delegados de nuestra Asamblea Constituyente estimaron necesario y prudente evitar que alguna de las ramas de nuestro Gobierno tuviera todo el poder. En nuestro sistema de pesos y contrapesos corresponde a la Rama Judicial velar porque las actuaciones del Gobierno no infrinjan los derechos de las personas:

Si se dijere que el cuerpo legislativo por sí solo es constitucionalmente el juez de sus propios derechos y que la interpretación que de ellos se haga es decisiva para los otros departamentos, es lícito responder que no puede ser ésta la presunción natural en los casos en que no se colija de disposiciones especiales de la Constitución. No es admisible suponer que la Constitución haya podido tener la intención de facultar a los representantes del pueblo para sustituir su voluntad a la de sus electores. Es mucho más racional entender que los tribunales han sido concebidos como un cuerpo intermedio entre el pueblo y la legislatura, con la finalidad, entre otras varias, de mantener a esta última dentro de los límites asignados a su autoridad. La interpretación de las leyes es propia y peculiarmente de la incumbencia de los tribunales. Una Constitución es de hecho una ley fundamental y así debe ser considerada por los jueces. A ellos pertenece, por lo tanto, determinar su significado, así como el de cualquier ley que provenga del cuerpo legislativo. Y si ocurriere que entre las dos hay una discrepancia, debe preferirse, como es natural, aquella que posee fuerza obligatoria y validez superiores; en otras palabras, debe preferirse la Constitución a la ley ordinaria, la intención del pueblo a la intención de sus mandatarios. A. Hamilton, *El Federalista*, LXXXVIII.

Por lo tanto, constituye un deber ineludible de todo ju-

rista reconocer la independencia judicial como un valor fundamental en nuestro sistema de gobierno, precisamente *para que los jueces no estén controlados o comprometidos con los programas de la otras ramas del Gobierno* y que gocen de libertad de criterio para fiscalizar las actuaciones gubernamentales indebidas. Cuando los otros mecanismos de la opinión pública y los procesos políticos ordinarios resultan insuficientes para determinar si una actuación del Gobierno es o no arbitraria, la Judicatura representa la última garantía para proteger la libertad de los ciudadanos.

> Esta independencia judicial es igualmente necesaria para proteger a la Constitución y a los derechos individuales de los efectos de esos malos humores que las artes de hombres intrigantes o la influencia de coyunturas especiales esparcen a veces entre el pueblo, y que, aunque pronto cedan el campo a mejores informes y a reflexiones más circunspectas, tienen entretanto la tendencia a ocasionar peligrosas innovaciones en el gobierno y graves opresiones del partido minoritario de la comunidad. ...[L]os representantes del pueblo no estan autorizados para violar las prevenciones de la Constitución vigente cada vez que una afición pasajera denominara a una mayoría de sus electores en un sentido contrario a dichas disposiciones, o que los tribunales estarían más obligados a tolerar las infracciones cometidas en esta forma que las que procedieran únicamente de las maquinaciones del cuerpo representativo. Mientras el pueblo no haya anulado o cambiado la forma establecida, por medio de un acto solemne y legalmente autorizado, seguirá obligándolo tanto individual como colectivamente; y ninguna suposición con respecto a sus sentimientos, ni aun el conocimiento fehaciente de ellos, puede autorizar a sus representantes para apartarse de dicha forma previamente al acto que indicamos. Pero *es fácil comprender que se necesitaría una firmeza poco común de parte de los jueces para que sigan cumpliendo con su deber como fieles guardianes de la Constitución, cuando las contravenciones a ella por el legislativo hayan sido alentadas por la opinión de la mayor parte de la comunidad.* (Énfasis suplido.) Hamilton, *op. cit.*

Por otro lado, este Tribunal tiene la función rectora adicional de pautar y darle contenido máximo al Derecho

puertorriqueño. Corresponde, pues, a este Tribunal fijar el significado de las disposiciones constitucionales encerradas en este recurso. Algunas de las cuestiones constitucionales planteadas aquí nunca han sido resueltas en esta jurisdicción. *Cf. Calderón, Rosa-Silva & Vargas v. García*, supra, págs. 811–812. Una mayoría de los miembros de esta Curia han entendido que en el descargo de la función referida, los planteamientos hechos respecto a tales cuestiones deben ser atendidos independientemente de la decisión final que recaiga en ellos. Negarle a este Tribunal su facultad para determinar si efectivamente las leyes ante nuestra consideración constituyen una afrenta a las garantías constitucionales invocadas por los recurrentes, con el propósito adicional de pautar el derecho encerrado y darle contenido a los principios constitucionales invocados, es negarle a esta Curia la esencia misma de la razón vital que justifica su existencia.

> The judges cannot refuse to decide cases because they personally believe the United States would be a more democratic country without judicial review. A preoccupation with the prudent and statesmanlike exercise of their duties can hardly be allowed to deny the existence of those duties. Anxious as they may be not to compromise the Court as an institution, and to avoid when possible the intense political pressures of hard cases, they should recall too that their great power exists to be used at the right times, not lost in atrophy. The Court can be destroyed by the weakness as well as the recklessness of its members... E.V. Rostow, *The Democratic Character of Judicial Review*, 66 Harv. L. Rev. 193, 213 (1952).

Por tales motivos, rechazo enérgicamente cualquier expresión que atente contra los sanos principios democráticos que han guiado la conciencia de una mayoría de los jueces de esta Curia al dar curso a la apelación presente. Tal tipo de expresión es la que, por su potencial efecto desorientador, puede terminar socavando en algún grado la confianza de la ciudadanía en el más Alto Foro apelativo del país.