Rossy García, Juez Ponente
*751 TEXTO COMPLETO DE LA SENTENCIA
El recurso instado en el caso de epígrafe interesa la revisión de una resolución emitida por la Junta de Planificación el 17 de enero de 1997, la que fuera notificada a la parte aquí recurrente el 25 de febrero de 1997. Mediante ésta, dicha agencia administrativa aprobó la consulta de ubicación sometida ante su consideración por la empresa Koeninger Development, Inc. para desarrollar el proyecto conocido como Christopher Columbus Landing Resort en el Barrio Borínquen del Municipio de Aguadilla. Esta acción respondió, a su vez, a la recomendación que la Junta de Planificación recibiera por parte del presidente de la Junta de Calidad Ambiental a los efectos de que se acestara "la DIA Preliminar como la DIA-Final de conformidad con la Sección 5.5.6.1. del Reglamento sobre Declaraciones de Impacto Ambiental [DIA]", ello "después de evaluar [éste] la información suplementaria sometida para el proyecto de epígrafe". Al tenor de dicha recomendación, la Junta de Planificación dio por finalizado el proceso de análisis ambiental por ella iniciado en cumplimiento de la política pública establecida por la Ley de Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, 12 L.P.R.A. see. 1121 et seq., procediendo así a emitir la resolución aquí recurrida.
Inconforme con dicho dictamen, la recurrente presentó oportunamente una moción de reconsideración ante la Junta de Planificación en la que expuso que "el permiso sobre consulta se otorgó en contravención a la Ley de Política Pública Ambiental y sus reglamentos instrumentadas [sic] y en contra del debido proceso de ley por lo que el mismo debe ser revocado y declarado nulo y sin efecto alguno". 
Transcurrido el término dispuesto por ley sin que las agencias recurridas Junta de Planificación y Junta de Calidad Ambiental de forma alguna actuaran sobre las referidas mociones, las recurrentes acuden en tiempo oportuno ante nos con la interposición del recurso que nos ocupa. En el mismo imputan la comisión de seis errores, cuatro de los cuales esencialmente van dirigidos a cuestionar la forma y manera en la cual tanto la Junta de Planificación como la Junta de Calidad Ambiental se condujeron en el proceso de convertir la DIA Preliminar preparada para el proyecto Christopher Columbus Landing Resort en la DIA Final, lo que eventualmente llevó a la aprobación de la consulta de ubicación impugnada. 
Perfeccionado el recurso y encontrándonos en condición de dictaminar luego de la comparecencia de los recurridos, resolvemos que resulta procedente expedir el auto solicitado para dictar sentencia revocatoria de la resolución recurrida.
Para colocar nuestro dictamen en correcta perspectiva, veamos inicialmente el trasfondo fáctico y procesal que culminó con la resolución recurrida.
La Empresa Koeninger Development Inc., sometió ante la consideración de la Junta de Planificación (Planificación) una consulta de ubicación para un proyecto mixto (residencial, turístico, comercial y recreativo) a desarrollarse en el Barrio Borínquen de la jurisdicción de Aguadilla. Planificación, como agencia proponente, luego de determinar que el desarrollo propuesto ocasionaría un impacto ambiental significativo sobre el medio ambiente, emitió una extensión de 120 días a la consulta para que el proyectista sometiera una declaración de impacto ambiental preliminar (DIA-P), ello en cumplimiento de las disposiciones pertinentes de la Ley de Política Pública Ambiental, Ley Núm. 9, supra, y su reglamento habilitador. Preparado como fue dicho documento ambiental, Planificación, como agencia proponente, sometió el mismo ante la consideración de la Junta de Calidad Ambiental (Calidad Ambiental) el 25 de enero de 1995. En esa misma fecha lo circuló a las agencias concernidas poniéndolo, además, a disposición de la ciudadanía para su inspección.
Así las cosas, y con el propósito de recibir los comentarios de las agencias concernidas, del proyectista y del público en general, Calidad Ambiental convocó a una vista pública, la que se celebró el 16 de junio de 1995. Recibida como fue en dicha ocasión la prueba testifical y documental aportada por todas las partes interesadas, el panel examinador procedió a rendir su informe, el que fue adoptado íntegramente por la Junta de Gobierno de Calidad Ambiental mediante resolución de 11 de septiembre de 1995. [4] Mediante dicho informe Calidad Ambiental concluyó que la DIA-P sometida no cumplía adecuadamente con el Art 4(C) de la ley bajo estudio y sus reglamentos instrumentadores. Al tenor, *752 notificó nueve (9) deficiencias a dicho documento y requirió de Planificación, agencia proponente, "la preparación de un suplemento donde se provea toda la información adicional necesaria para poder llevar a cabo una evaluación adecuada del impacto ambiental de la acción propuesta". En consecuencia, con fecha de 1ro. de noviembre de 1995 Planificación emitió una resolución dejando en suspenso la consulta de ubicación de referencia hasta tanto se suplementara la DIA-P conforme a las directrices señaladas por Calidad Ambiental.
El 23 de enero de 1996 se recibió en Calidad Ambiental un suplemento a la DIA-P, a raíz de lo cual la Junta de Gobierno de dicha agencia ordenó la celebración de nuevas vistas públicas para considerar y recibir comentarios al mismo. En el ínterin, y a pesar de no haberse concluido aún con el proceso de análisis ambiental iniciado por Calidad Ambiental, Planificación decidió continuar con el trámite, señalando vistas públicas para los días 23 y 26 de febrero de 1996. Posteriormente, el 3 de julio de 1996, Planificación emitió una resolución dejando en suspenso la consulta "hasta que se cumpla con la Ley de Política Pública Ambiental (Ley Núm. 9)." 
Por su parte, Calidad Ambiental celebró las vistas públicas ordenadas para considerar si el suplemento a la DIA-P sometido subsanaba las deficiencias señaladas anteriormente. Así, el 23 de julio de 1996 el Oficial Examinador Sr. Olivero Barreto rindió un nuevo informe a la Junta de Gobierno de Calidad Ambiental, el que fue adoptado en su totalidad por dicho cuerpo el 29 de julio de 1996. Al respecto se emitió una Resolución y Notificación que fuera archivada en el expediente el subsiguiente 9 de agosto, la que fue acatada por las partes al no solicitar éstos reconsideración alguna. Conforme a los hallazgos incorporados en dicha resolución, surge que Calidad Ambiental concluyó que el suplemento a la DIA-P presentado ante su consideración no subsanaba las deficiencias señaladas en varios aspectos, por lo que aún no cumplía con los requisitos del artículo 4 (C) de la ley bajo estudio. Entre otros extremos, el informe del Panel Examinador señala que:

"1. La DIA fracciona el análisis del impacto ambiental al posponer para la etapa de diseño y construcción la consideración de aspectos fundamentales al proceso de análisis del impacto ambiental. Posponen el análisis geológico y con ello la evaluación de los sumideros del lugar...

... 3. La DIA omite por completo el análisis del impacto, si alguno, que tendrá la construcción y operación del proyecto en la franja costanera que bordea el predio de terreno por su lado oeste en aproximadamente un kilómetro lineal de frente de playa.

4. El documento carece de una discusión del probable impacto ambiental de la acción propuesta sobre la calidad de los cuerpos de agua subterráneos que se encuentran en el lugar.

5. De igual manera carece de un análisis evaluativo del posible impacto de la escorrerctía sobre estos cuerpos de agua.

6. Carece de una evaluación del posible impacto de la erosión de terreno que se generará durante la fase de construcción sobre los cuerpos de agua subterráneos y sobre el área marina....". (Véase Informe Suplementario del Panel Examinador, Apéndice del recurso, pág. 49).
Procedió así Calidad Ambiental a requerir a Planificación que realizara los estudios allí señalados; que incorporara el resultado de los mismos a la DIA-Final de manera que reflejara "toda la información adicional necesaria para poder llevar a cabo una evaluación adecuada del impacto ambiental de la acción propuesta"; que asimismo incorporara "una discusión de los comentarios hechos por cada una de las agencias consultadas y por el público en general", apercibiendo, además, a dicha agencia proponente, que "el documento a someterse no [deberá ser] considerado como DIA-Final hasta tanto la Junta [de Calidad Ambiental] determine que se han subsanado las deficiencias señaladas en este informe". (Enfasis nuestro).
Surge de los autos que en función de dicha resolución, Planificación emitió otra con fecha de 21 de agosto de 1996 dejando en suspenso "todo trámite ulterior" sobre la consulta de ubicación, hasta que el proyectista Koeninger sometiera la información requerida y realizara los estudios ordenados por *753 Calidad Ambiental de manera tal que se culminara con el proceso de evaluación ambiental requerido por el Art. 4(C) de la Ley Núm. 9, supra. 
Así las cosas, con fecha de 26 de noviembre de 1996, la Sra. María del C. Gordillo, funcionario responsable de las DIA en la agencia proponente, Planificación, cursó una carta dirigida al Ledo. Héctor Russe Martínez (Ledo. Russe), Presidente de la Junta de Calidad Ambiental, en la cual expuso que "[l]os documentos que se adjuntan así como esta misiva suplementan la Declaración de Impacto Ambiental Preliminar circulada para la acción propuesta", con lo cual "esperajba] dar cumplimiento con las disposiciones del Artículo 4c de la Ley Sobre Política Pública Ambiental...". [10] Sin ulterior trámite, y en contestación a dicha comunicación, surge del expediente que catorce días más tarde, o sea, el 10 de diciembre de 1996 y antes de que Planificación publicara el debido "anuncio ambiental", el Ledo. Russe contestó la misma mediante carta, en la que expuso que "[Ijuego de evaluar la información suplementada sometida para el proyecto de epígrafe, esta Junta recomienda que se acepte la DI A-Preliminar como DI A-Final en conformidad con la Sección 5.5.6.1 del Reglamento sobre Declaraciones de Impacto Ambiental". Ahora bien, no surge cómo tal información adicional podía cumplir con lo previamente requerido por Calidad Ambiental. De otra parte dicha comunicación, constituyendo una adjudicación final por parte de dicha agencia con relación al cumplimiento de la acción propuesta con el Art. 4(C) de la ley que consideramos, no fue notificada a todas las partes interesadas en el proceso de evaluación ambiental seguido ante Calidad Ambiental para el proyecto en cuestión. Surge de los autos, además, que con posterioridad a estos eventos, con fecha de 15 de diciembre de 1996, es que Planificación procedió a publicar un "Anuncio Ambiental" en un periódico de circulación general en el que se informaba que "[e]n cumplimiento con las disposiciones del Artículo 4 (c) de la Ley Núm. 9 del 18 de junio de 1970, según enmendada, conocida como Ley Sobre la Política Pública Ambiental de Puerto Rico, la Junta de Planificación agencia originadora,...ha sometido a la Junta de Calidad Ambiental la Declaración de Impacto Ambiental Final (DIA-F)...[c]opia de la [cual] se encuentra disponible para la inspección del público en las Bibliotecas de la Junta de Planificación y Junta de Calidad Ambiental". 
Es con este trasfondo que Planificación, con fecha de 15 de enero de 1997 emite la resolución aquí recurrida mediante la cual, fundada en la determinación del Ledo. Russe y convirtiendo la DIA-Preliminar sometida en una DIA Final, aprueba la consulta de ubicación del proyecto Christopher Columbus Landing Resort.
Notificada como fue dicha resolución y luego de serles denegadas por inacción las mociones de reconsideración que presentaran los aquí recurrentes, procedieron éstos a interponer el recurso de revisión que nos ocupa, impugnando tanto "el proceso de aprobación de la suplementación a la DIA-P, como la conversión a DIA-F sin participación en el análisis ambiental de la suplementación, y la posterior aprobación de la consulta". Según ya indicado, y por los fundamentos que pasamos a exponer, resolvemos que resulta procedente expedir el auto de revisión solicitado para revocar la resolución recurrida.
En términos generales, los recurrentes imputan a las recurridas, Junta de Planificación y Junta de Calidad Ambiental, una infracción a las disposiciones pertinentes de la Ley de Política Pública Ambiental, Ley Núm. 9, supra, y al reglamento habilitador promulgado a su amparo para regir el procedimiento a seguirse en la preparación de una declaración de impacto ambiental. Argumentan, entre otros extremos, que se infringieron las disposiciones de dicha ley al haber ocurrido un trastoque, o confusión, en cuanto a los deberes y responsabilidades allí delegados al Presidente de dicho cuerpo, por un lado, y aquéllos que le corresponde ejercer a "sus miembros constituidos en Junta", de otro, ello de acuerdo a la división de funciones según contemplado en las secciones 1130 y 1131, respectivamente, del susodicho estatuto. Tal argumentación nos mueve a examinar los orígenes de la Ley de Política Pública Ambiental y sus propósitos; la promulgación del reglamento que rige la formulación de las declaraciones de impacto ambiental y la relación entre Calidad Ambiental y las demás agencias de gobierno; y el proceso de evaluación que supone la adopción del documento ambiental de que se trate. Finalmente examinaremos la delegación de funciones que tanto el estatuto como el reglamento, le hace a dicha Junta en lo relacionado a las declaraciones de impacto ambiental.
*754 -A-
LA LEY DE POLITICA PUBLICA AMBIENTAL Y LA APROBACION DEL REGLAMENTO SOBRE DECLARACIONES DE IMPACTO AMBIENTAL
La Constitución del Estado Libre Asociado de Puerto Rico constituye el punto de partida al cual debemos remitirnos para encontrar la génesis de toda legislación posterior que promulgue el establecimiento de la más deseable y conveniente armonía entre el hombre y su medio ambiente. Al tenor, observamos que desde su vigencia en 25 de julio de 1952, en su Artículo VI —el cual versa sobre disposiciones generales— nuestra Carta Magna decreta que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad...". Constitución del Estado Libre Asociado de Puerto Rico, Art. VI, Sec. 19.
En consideración a dicho mandato nuestra Asamblea Legislativa aprobó el estatuto conocido como la Ley Sobre Política Pública Ambiental, Ley Núm. 9, supra, disponiendo allí que sus fines son "establecer una política pública que estimule una deseable y conveniente armonía entre el hombre y su medio ambiente; fomentar los esfuerzos que impedirían o eliminarían daños al ambiente y la biosfera y estimar la salud y el bienestar del hombre; enriquecer la comprensión de los sistemas ecológicos y fuentes naturales importantes para Puerto Rico y establecer una Junta de Calidad Ambiental". 12 L.P.R.A. see. 1122. Para fomentar y lograr los propósitos que se esbozan en la Ley, ordena ésta en su Art. 4, 12 L.P.R.A. sec. 1124, en lo pertinente, que:

"los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades [sic] del [ELA]..., en la implantación de la política pública de este Capítulo, cumplan con las siguientes normas:

(C) incluir en toda recomendación o informe propuesta de legislación y emitir, antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente, una declaración escrita y detallada sobre:

(i) el impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;

[a cuyos fines], se faculta a la Junta de Calidad Ambiental para aprobar reglamentos para implementar las disposiciones de este inciso.

Surge así claramente, que el legislador concibió a dicha Junta como el organismo encargado de la implantación de la ley y de la regulación de las materias de su competencia y expresamente le adscribió la función de evaluar si una "acción" propuesta por una agencia, corporación pública o dependencia del Estado Libre Asociado de Puerto Rico, cumple con el espíritu y la letra del citado Artículo 4(C) de la ley de referencia.
Para dar virtualidad al compromiso del Estado con el medio ambiente según pautado en el estatuto bajo estudio, y según allí autorizado, el 23 de mayo de 1984 Calidad Ambiental promulgó el Reglamento Núm. 3106, Reglamento sobre Declaraciones de Impacto Ambiental de Puerto Rico, "para hacer cumplir las disposiciones de dicho Artículo [4(C)]". Sec. 1.1. Así, la Sec. 1.2(c) indica que el propósito del reglamento es establecer los requisitos procesales y de contenido necesarios para la debida implantación del Artículo 4 y cumplir con los objetivos de la ley. Las secciones subsiguientes nos indican que el reglamento en cuestión aplica a toda la rama ejecutiva del ELA y a los gobiernos municipales, "no obstante lo cual la [JCA] será la instrumentalidad [sic] responsable de reglamentar y administrar el proceso de las DIA. Por lo tanto, estará sujeta al proceso desde el punto de vista de fiscalización", Sec. 1.4, disponiendo, además, que ninguna agencia causará o tomará *755 _ acción alguna que tenga o pueda tener impacto ambiental significativo sin antes dar cumplimiento con: (a) las Guías para la Preparación de las DIA's; y (b) cualesquiera otras disposiciones aplicables de este Reglamento. Sec. 1.5. Como veremos más adelante, si bien es cierto que es la agencia proponente la que decide la clase de documento que preparará y someterá en cumplimiento del Artículo 4(C), ninguna duda debe existir en cuanto a que la determinación respecto a la adecuacidad y suficiencia de tal documento recae sobre la Junta de Calidad Ambiental.
-B-
LAS DIA Y EL PROCESO DE SU EVALUACION Y EVENTUAL ADOPCION EN CUMPLIMIENTO DEL ARTICULO 4(C)
Según expuesto, la obligación de formular una declaración de impacto ambiental es exigible cuando una agencia de gobierno contempla tomar una "acción" que tiene o puede tener un impacto ambiental significativo. Al tenor, y para guiar la discreción de las agencias, el reglamento bajo estudio define dicho término como:

"[l]a toma de decisiones o cualquier otro tipo de actividad que auspicie, fomente o proponga una agencia del Estado Libre Asociado de Puerto Rico, tales como, actividades de: expedir licencias, concesiones o permisos, reglamentar o formular normas, asignar o liberar fondos, realizar cambios sustanciales en la política pública de las agencias y sus programas, aprobar proyectos a través de permisos o cualquier otra decisión reguladora, zonificar, rezonificar y presentar propuestas de legislación. Entendiéndose que cuando al tomar la decisión o implantar la acción en cuestión, envuelva a más de un agencia, la misma se denominará acción multiagencial, Sec. 2.1(a), y describe que la agencia proponente

”[e]s la agencia o instrumentalidad [sic] del Estado Libre Asociado de Puerto Rico que se propone llevar a cabo una acción para la cual se requiere una Declaración de Impacto Ambiental (DIA), o una Determinación de Impacto Ambiental No Significativo (D-N), o en caso de una acción multiagencial, la agencia o instrumentalidad que asume la responsabilidad de cumplir con el Artículo 4 de la Ley Número 9 del 18 de julio de 1970, según enmendada."

De conformidad con esta última definición, se observa que en el cumplimiento del Art. 4(C), supra, la agencia proponente puede someter ante la consideración de Calidad Ambiental uno de varios documentos ambientales allí mencionados, los que a continuación describimos de acuerdo al reglamento:
"Declaración de Impacto Ambiental (DIA)- Es un proceso que analiza una propuesta acción gubernamental desde el punto de vista de su efecto sobre el ambiente, y los riesgos a la salud pública, según lo dispone el Artículo 4(C) de la Ley Número 9 del 18 de julio de 1970, según enmendada y las disposiciones aplicables de este Reglamento y que culmina con un Documento de Viabilidad Ambiental. Sec. 2.lh.

DIA Preliminar (DIA-P)- Es la DIA que será preparada por la agencia proponente para consultar y obtener los comentarios del público, la Junta de Calidad Ambiental y las agencias comentadoras respecto a la acción propuesta. Sec. 2.U.

DIA Final (D1A-F)- Es la DIA que preparará la agencia proponente incorporando y ofreciendo consideración a los comentarios del público, de la JCA y/o de las agencias comentadoras respecto a la DIA Preliminar o a cualquier suplemento de la misma. Sec. 2.lj.

Determinación de Impacto Ambiental No Significativo (D-N)- Es un documento preparado por la agencia proponente en el cual se determina o apoya una determinación en el sentido de que la acción propuesta no afecta significativamente el ambiente, en cumplimiento con lo requerido en la Sección 5 de este Reglamento. Sec. 2.lk."

Podemos aquí afirmar, de entrada, que el propósito encamado tanto en la declaración de principios promulgada por la Ley Núm. 9, supra, de que "toda persona tiene la responsabilidad de contribuir a la conservación y mejoramiento del medio ambiente", 12 L.P.R.A. sec. 1123(c), como en la *756 declaración de política pública contenida en el reglamento que enuncia que dicho estatuto persigue " [ejstimular y facilitar el envolvimiento público en decisiones que afecten la calidad del ambiente humano", Sec. 1.2g, está fielmente recogido en tales disposiciones mediante la participación que se le reconoce al público de someter sus comentarios no sólo cuando se contempla la preparación de una DIA-P, la cual debe considerar las inquietudes y planteamientos de éstos, sino que la misma participación se le garantiza a dicho público sobre los suplementos que sean incorporados a dicha DIA-P cuando así se le ha requerido a la agencia proponente por parte de Calidad Ambiental, y hasta su conversión en DIA Final, según comprobaremos más adelante.
Dirigiendo nuestra atención a la situación particular del caso que nos ocupa en lo atinente a las DIA, debemos iniciar por señalar que ninguna controversia existe en cuanto a que la "acción" propuesta por Planificación requiriere la formulación de una DIA, toda vez que dicha agencia determinó de antemano que el desarrollo del proyecto Christopher Columbus Landing Resort causaría un impacto ambiental significativo. En su virtud, consideremos en este momento las disposiciones de la sección 5 del reglamento bajo estudio, la cual versa sobre "El Proceso de Declaración de Impacto Ambiental".
Del examen de la referida sección del Reglamento se desprende que en ésta, luego de imponer la responsabilidad por la preparación de una DIA (Sec. 5.1), señala qué acciones requerirán una DIA (See. 5.2), establece sus requisitos de contenido (See. 5.3) y delimita el ámbito de la DIA (See. 5.4), cuestiones que no están planteadas ante nuestra consideración. Pasa entonces a establecer en el acápite 5 de la referida sección 5 (5.5) los requisitos procesales envueltos en la preparación y evaluación de una DIA, sea ésta una simple DIA, una DIA actualizada, una DIA Preliminar o Preliminar suplementada, y los pasos a seguir cuando la agencia proponente determina considerar una DIA Preliminar en una DIA Final, o sea, cuándo y cómo una DIA-P podrá ser considerada como una DIA-F.
A grandes rasgos, la sección 5.5.1 dicta pautas generales aplicables a todas las etapas por las que pasa una DIA. Así, se ordena que una DIA debe ser preparada con premura dentro del proceso decisional; que la misma debe ser actualizada cuando surja información adicional que represente un impacto ambiental significativo no considerado inicialmente durante el proceso de evaluación; establece que la preparación de una DIA es un proceso público en el cual deben participar Calidad Ambiental, las demás agencias concernidas y el público en general; ordena que una DIA Final debe incorporar dicha información adicional antes de que una decisión sobre la "acción" propuesta conlleve comprometer los recursos naturales o el ambiente de manera incompatible con los propósitos de la ley; faculta a Calidad Ambiental para ordenar una DIA-P o un suplemento, aun cuando se haya procesado una DIA-F, si dicha agencia fiscalizadora considera que variaciones sustanciales a una "acción" conllevan un impacto ambiental significativo, y "requiere que aun cuando se trate de una acción o proyecto a implementarse por etapas, la DIA a prepararse debe incluir la totalidad del mismo, discutiendo cada etapa así como el conjunto total de éstas." Sees. 5.5.1-5.5.1.5. (Enfasis suplido).
De otra parte, la sección 5.5.2 representa el esquema a seguirse antes de prepararse una DIA-F, o sea, que procedimientos son los pertinentes a una DIA-Preliminar. Entre ellos se destaca la sección 5.5.2.2 la cual, en lo pertinente, ordena que:

"[cjuando la DIA Preliminar sea circulada para comentarios, la agencia proponente deberá notificar al público sobre su disponibilidad para inspección, así como de su derecho a comentar la misma. Esta notificación deberá hacerse mediante la publicación de un aviso ambiental en un periódico de circulación general por un día. Esta notificación deberá publicarse dentro del término de diez (10) días a partir de la fecha en que la DIA Preliminar fue sometida a la Junta."

Así, al tenor de lo dispuesto en la sección 5.5.2 --la cual aplica siempre que esté indicado recibir comentarios sobre una DIA-P o un suplemento— las secciones subsiguientes establecen la forma y manera en que las agencias concernidas y el público deberán someter sus comentarios a la DIA-P y el término de tiempo de que disponen para así proceder. Sees. 5.5.3 y 5.5.4.
De particular pertinencia al caso de autos resulta ser lo dispuesto en la sección 5.5.5, en la cual *757 Calidad Ambiental regula su propio proceder respecto de cómo conducirse una vez recibe los comentarios sobre la DIA sometida por la agencia proponente, la cual debe llegarle a Calidad Ambiental antes de que se publique el anuncio ambiental. Al tenor, "[l]a Junta [de Calidad Ambiental] deberá someter sus comentarios dentro de los quince (15) días calendario después de haber recibido los comentarios de otras agencias o instrumentalidades consultadas y del Público ", lo cual es lógico y se espera que ocurra una vez la agencia proponente pública el aviso ambiental al cual se ha hecho referencia previamente, y para lo cual el reglamento les concede un término de treinta (30) días a partir de dicha publicación. (Enfasis suplido). Así, surge claramente que Calidad Ambiental sólo puede emitir sus comentarios al documento ambiental sometido por la agencia proponente una vez transcurridos los treinta (30) días reglamentarios concedidos para que tales agencias, el público, o ambos, sometan los de ellos. 
Una vez recibidos los comentarios de todas las partes interesadas, incluyendo los de Calidad Ambiental, los de las agencias concernidas y los del público en general sobre la DIA-P, la sección 5.5.6 le fija un término a la agencia proponente para preparar una DIA-F en la que debe incorporar dichos comentarios y exponer las modificaciones a la acción propuesta que estime necesarias en virtud de los mismos.
Finalmente, y en lo que nos concierne, el reglamento establece las condiciones sustantivas y procesales que deben mediar para que la agencia proponente pueda considerar la DIA-P como DIA-F. Al tenor, ello sólo será posible cuando:

"a. La DIA Preliminar preparada satisfaga todos los requisitos del Artículo 4(C) de la Ley Número 9, supra, y de este Reglamento.

b. Los comentarios hechos sobre la DIA Preliminar sean favorables.

c. La preparación de una DIA Final constituya una repetición de la información incorporada a la DIA Preliminar.

ch. No existan comentarios de importancia que considerar en una DIA Final, y

d.Cuando la Junta [de Calidad Ambiental] así lo recomiende." See. 5.5.6.1.
De otra parte, y previendo aquellos casos en que la agencia proponente determina considerar la DIA Preliminar como una DIA Final, el reglamento le ordena a dicha agencia que ésta debe proceder conforme a lo establecido en la Sec. 5.5.2.2, supra, (publicación de un anuncio ambiental), lo que implícita e irremediablemente la refiere al proceso a seguirse con posterioridad a dicha publicación contemplado en las secciones 5.5.3 a la 5.5.6, supra, al cual se ha hecho referencia. (Recibir comentarios de las agencias concernidas y del público en general, etc.)
En resumen, y en lo pertinente al caso que nos ocupa en su vertiente procesal, el reglamento sobre declaraciones de impacto ambiental establece con claridad meridiana que este es un proceso público donde se le reconoce una amplia participación a la ciudadanía en todas sus etapas; que es en Calidad Ambiental --o como la denomina el reglamento, la Junta o su Junta de Gobierno— sobre quien recae, en el descargo de su función fiscalizadora, la responsabilidad de hacer cumplir la política pública según contemplado en la ley que la creó; que una DIA no podrá ser estimada por la agencia proponente como una DIA Final sin que medie una recomendación favorable de la Junta; y que dicha misión encomendada a Calidad Ambiental sólo puede ser descargada cuando la Junta tiene ante sí, y no antes, el insumo de todas las partes concernidas e interesadas en la "acción" para la cual se está considerando el impacto que ésta tendrá sobre el medio ambiente y la determinación de su viabilidad ambiental. Sec. 2.1h.
-C-
LAS FUNCIONES Y DEBERES DEL PRESIDENTE Y. LOS DE LA JUNTA DE CALIDAD AMBIENTAL RESPECTO DE LAS DECLARACIONES DE IMPACTO AMBIENTAL
*758 La Ley de Política Pública Ambiental, supra, según originalmente aprobada por nuestra legislatura, asignó todas las facultades y deberes concedidos por el estatuto a la Junta de Calidad Ambiental, Art. 11, 12 L.P.R.A. sec. 1131, organismo establecido asimismo por éste. Art. 2, 12 L.P.R.A. see. 1122. Aunque se contempló en ese momento que habría un presidente de dicha Junta —nombrado por el Gobernador de entre sus miembros ex-oficio~ surge como realidad incontrovertida que la ley no le delegó funciones o deberes particulares a dicho funcionario.
II
Mediante enmienda, la composición de la Junta de Calidad Ambiental quedó constituida de tres miembros asociados nombrados por el Gobernador con el consentimiento del Senado -de entre los cuales el Gobernador designaría a su presidente- y de un miembro alterno que sustituiría a los asociados en las situaciones especificadas en el estatuto. 12 L.P.R.A. see. 1129. Esa misma ley enmendatoria, Ley Núm. 25 de 10 de julio de 1978, creó un Consejo Consultivo adscrito a Calidad Ambiental compuesto por los varios funcionarios del gobierno allí nombrados. 12 L.P.R.A. 1130a. De otra parte, su sección 2 enumeró los deberes del Presidente, aspecto que no fue contemplado cuando se aprobó inicialmente la ley bajo estudio, según se ha expuesto. 12 L.P.R.A. sec. 1130. Ahora bien, al analizar esta última sección, observamos que en su virtud se transfirieron al Presidente varias de las funciones, deberes y facultades que "previamente" eran de la competencia de "la Junta" (incisos 7, 8, 10,16, 17, 20, 24, 31 y 32 de 12 L.P.R.A. see. 1131). Lo anteriormente dicho no obstante, allí mismo quedó consignado que la facultad de "requerir la preparación y emisión de una Declaración de Impacto Ambiental conforme a las disposiciones del inciso (c) de la see. 1124 [de la Ley Núm. 9, supra, sec. 1131(24)]", siguió formando parte de los "deberes, facultades y funciones" de. "la Junta", aun cuando el resto de las facultades dispuestas en dicho inciso sí le fue asignado al Presidente. Esto apunta a que el legislador consideró que las decisiones relacionadas con el impacto ambiental de una "acción " sobre las cuales debe pasar juicio Calidad Ambiental, son determinaciones que deben ser tomadas de forma colegiada por dicho organismo, y que no deben estar sujetas al arbitrio exclusivo de una persona. En perfecta armonía, el reglamento que aprobó Calidad Ambiental "para establecer requisitos de contenido y procedimientos administrativos para dar cumplimiento al proceso de Declaración de Impacto Ambiental (DIA), dispuesto por el Artículo 4(C) [de la Ley Núm. 9 [supra] en ningún lugar del mismo le adjudica (ni tan siquiera lo menciona), al Presidente de "la Junta" facultad alguna respecto a tales documentos ambientales o cualquier decisión que sobre ellos se deba tomar. Todo lo contrario: en todo momento se hace referencia a "la Junta" o a "la Junta de Gobierno". Define así el reglamento "Junta, Junta de Calidad Ambiental", como "la agencia reguladora creada por la Ley Sobre Política Pública Ambiental, según enmendada, con los deberes y facultades y funciones conferidas en dicha ley”. Sec. 2.1 v. De otra parte, se define la Junta de Gobierno "como aquel cuerpo director de la Junta de Calidad Ambiental creado por la Ley Sobre Política Pública Ambiental constituido por un Presidente, dos Miembros Asociados y un Miembro Alterno, los cuales son responsables de implantar las funciones asignadas por dicha Ley", Sec. 2.1w, descripción que está en armonía con el estatuto cuando éste dispone que "[l]a Junta [refiriéndose a la Junta de Calidad Ambiental] se compondrá de tres (3) miembros asociados". 12 L.P.R.A. see. 1129 (a). Al tenor, resulta obvio que los términos "Junta de Calidad Ambiental", de acuerdo a la ley, y "Junta de Gobierno", según contemplado en el reglamento, son intercambiables; que los mismos se refieren a un cuerpo colegiado sobre el cual recae la responsabilidad de "implantar las funciones asignadas por dicha ley", y que bajo ninguna circunstancia el "Presidente de la Junta" está llamado a ejercer, ni ninguno otro de sus miembros en su capacidad individual, autoridad alguna en lo que respecta a las declaraciones de impacto ambiental. Al tenor, y en lo pertinente al caso de autos, cuando el reglamento dispone que "[la Agencia proponente podrá considerar la DIA Preliminar como DIA Final...cuando la Junta así lo recomiende", Sec. 5.5.6.1(d), es eso precisamente lo que quiere significar: la Junta, y no su Presidente. Refuerza nuestro criterio, además, la disposición contenida en la misma sección 2 de la citada ley enmendatoria, la cual claramente y sin ambages ordena que "los miembros asociados constituidos en Junta serán responsables por descargar los deberes, facultades y funciones enumerados en la see. 1131 de este título", 12 L.P.R.A. see. 1130 (Supl. 1995), disposición que armoniza totalmente con uno de tales "deberes, funciones y facultades" citados anteriormente, cual es que es "la Junta [la que] podrá requerir la preparación y emisión de una Declaración de Impacto Ambiental conforme a las disposiciones del inciso (c) de la see. 1124 de este título". Ante la realidad de ley de que en las funciones específicamente delegadas al Presidente no se haya incluido ninguna relativa a la toma de decisiones con respecto a lo concerniente a las declaraciones de impacto ambiental, forzoso resulta concluir que toda determinación referente a éstos *759 son del dominio exclusivo de "la Junta".
De otra parte, la sección 5.5.5, difiere la capacidad de "la Junta" de emitir una recomendación o "someter sus comentarios" respecto de un documento ambiental preparado en cumplimiento del Art. 4(C), supra, hasta "después de haber recibido los comentarios de otras agencias o instrumentalidades consultadas y del público". Evidente resulta que la autoridad para recomendar considerar una DIA Preliminar como una DIA Final fue conferida a la Junta y no al Presidente en su capacidad individual.
No podemos, en consecuencia, avalar la determinación de la Junta de Planificación aprobando la consulta de ubicación de epígrafe mediante la resolución recurrida, descansando en la determinación individual del Presidente de ésta, quien recomendó considerar una DIA Preliminar como una DIA Final. Para ello se requería una decisión adoptada por "[l]os miembros asociados constituidos en Junta".
m
Dirigiendo nuestra atención ahora a la situación particular del caso que nos ocupa a la luz de los principios antes reseñados, se desprende de los autos que la Junta de Planificación de Puerto Rico, en la consideración de la consulta de ubicación propuesta por el desarrollador Koeninger Development, Inc. (Koeninger) para la construcción del proyecto Christopher Columbus Landing Resort, inició los trámites pertinentes para determinar su viabilidad ambiental. Al tenor, y en el cumplimiento de lo ordenado por el Art. 4(C) de la Ley Núm. 9, supra, sometió ante la consideración de la Junta de Calidad Ambiental el documento ambiental conocido como DIA Preliminar, documento base para dar inicio al trámite conducente a la obtención de una recomendación favorable de la referida Junta que permitiera el desarrollo del referido proyecto de manera armoniosa con los propósitos perseguidos por la Ley Sobre Política Pública Ambiental, supra.
Según surge del expediente ante nos, en su reunión de 6 de abril de 1995, Planificación acordó, entre otras cosas:

"]. [aceptar] como interventores a la Liga Ecológica del Noroeste de Puerto Rico, Inc... y al Comité de Ciudadanos para el Bienestar de Playuela...[aquí recurrentes].

2. [que] las partes [deberán] notificarse mutuamente de cualquier escrito que se radique ante la Junta de Planificación." 

Aunque no surge de dicho texto, es obvio que "las partes" a las que se refiere el citado inciso 2 incluye, además de las aquí recurrentes, al desarrollador Koeninger, a quien inicialmente Planificación le exigió someter la documentación necesaria para la preparación de la DIA Preliminar y, posteriormente, presentar de igual forma aquélla que le permitiera cumplir con las exigencias de Calidad Ambiental para subsanar las deficiencias señaladas mediante una DIA suplementada. Al tenor, y como corolario del contenido de los referidos acuerdos recogidos en dicha resolución. Por su parte, venía obligada Planificación a cumplir con las disposiciones aplicables del reglamento sobre declaraciones de impacto ambiental en cuanto a la "publicidad" del proceso por ella iniciado como agencia proponente.
Al enmarcar las actuaciones de Planificación dentro de este marco procesal impuesto por ley y por sus propias determinaciones, así como las de Calidad Ambiental, observamos que Planificación procedió a solicitar de Koeninger que satisficiera las exigencias señaladas por Calidad Ambiental, ello en cumplimiento con la referida resolución de 29 de julio de 1996, mediante la cual exigió de Planificación subsanar deficiencias a la DIA Preliminar mediante otra suplementación. Dio ello base a que el proyectista sometiera a Planificación documentación encaminada a suplementar la DIA Preliminar, incluyendo, además, la posición por ella asumida de cuestionar la necesidad de los estudios exigidos por Calidad Ambiental en esa etapa. Al respecto sostenía Koeninger ante Calidad Ambiental que "los aspectos geológicos e hidrológicos deben dejarse para la fase operacional del proyecto". Surge, además, que dichas gestiones fueron realizadas sin que Koeninger notificara de las mismas a las recurrentes, a lo cual estaba obligado de acuerdo a la resolución adoptada por Planificación el 6 de abril de 1995. De igual forma, Planificación recibió esa documentación, y actuó sobre ella, sin exigirle a Koeninger que cumpliera con el requisito de notificar de la misma a las *760 recurrentes, o proceder ella misma a así hacerlo en cumplimiento del debido proceso que les reconoció mediante los términos de dicha resolución. Al así proceder, resulta evidente que Planificación privó a las recurrentes no sólo del derecho a la participación que les reconoció en aquella ocasión, sino que obvió el procedimiento establecido en el reglamento que rige la formulación de una DIA Preliminar, en su vertiente de suplementación, ello según dispuesto en la sección 5.5.2 et seq. del mismo, cuyo cumplimiento le es exigible a Planificación, Sec. 1.4. Con este limitado alcance, la notificación posterior a las recurrentes en el momento en que ésta le remite esa información a Calidad Ambiental no subsana tal incumplimiento.
De otra parte y según ya expuesto, cuando la agencia proponente de una "acción" determina considerar la DIA Preliminar como DIA Final, al igual que cuando una DIA Preliminar es circulada para comentarios, ésta viene obligada a publicar un anuncio ambiental, concediendo el Reglamento a las partes y al público un término de treinta (30) días para formular sus comentarios. La Junta de Calidad Ambiental deberá, entonces, someter sus comentarios dentro de los quince (15) días calendario de haber recibido los señalamientos de las otras agencias consultadas y del público, el que evidentemente habrá de comenzar a decursar luego de expirar los treinta (30) días a partir de dicha publicación. En el caso de autos Planificación procedió a publicar el anuncio requerido el 15 de diciembre, esto es, con Posterioridad a que el Ledo. Russe, Presidente de la Junta de Calidad Ambiental, le dirigiera la "carta" a Planificación ofreciendo "su" recomendación, como decisión de "la Junta", de que se aceptara la DIA Preliminar como la DIA Final en el caso de autos. Evidentemente, al así emitir tal recomendación, se omitió el trámite dispuesto por reglamento, dejando así de considerar "Calidad Ambiental los comentarios de otras agencias o instrumentalidades consultadas y del público", por lo que ninguna validez podemos atribuir a tal actuación toda vez que priva al público del derecho que le fue conferido de someter sus comentarios ANTES de que Calidad Ambiental ofrezca su recomendación final, derecho que permea todas las disposiciones adoptadas por esa misma agencia mediante el reglamento que nos ocupa. A tales efectos, claramente se dispone en el Reglamento que una vez publicado el anuncio ambiental, tanto a las agencias concernidas como al público en general tendrán un término de treinta (30) días para someter sus comentarios a la agencia proponente, así como a Calidad Ambiental, acerca del documento sometido para evaluación de esta última en cuanto a su adecuación en el cumplimiento del Art. 4(C) de la ley bajo estudio. Sees. 5.5.3 y 5.5.4. Al tenor, y tomando en consideración dicho período de tiempo, la sección 5.5.5 claramente y sin ambages dispone que Calidad Ambiental "deberá someter sus comentarios dentro de los quince (15) días calendario DESPUES de haber recibido los comentarios de otras agencias o instrumentalidades [sic] consultadas y del público", pronunciamiento que presupone que esos quince días comienzan a decursar a partir del último día de que aquéllos disponen para así proceder, o sea, los treinta días a partir de la publicación del anuncio ambiental, Y NO ANTES. See. 5.5.5. Al tenor, resulta obvio que la alegada recomendación de "la Junta" de Calidad Ambiental, por voz de su presidente, Ledo. Russe, emitida en abierta infracción a lo dispuesto en dicha sección, está viciada de nulidad por violar el debido proceso de ley recogido en su propio reglamento y la misma no puede tener ninguna trascendencia en derecho respecto al proyecto propuesto por Koeninger. Basta con señalar que las actuaciones de las agencias administrativas deben ser cónsonas con los reglamentos que le son aplicables y que una vez aprobadas, éstas no guardan discreción para no obedecerlo. García Cabán v. U.P.R., 120 D.P.R. 167 (1987); Díaz de Llovet v. Gobernador, 112 D.P.R. 747 (1982).
Ahora bien e independientemente de lo antes indicado, la determinación del Ledo. Russe, en su carácter individual, a los efectos de que se aceptara la DIA Preliminar como la DIA Final, es contraria a derecho y constituye una actuación "ultra vires” de su parte, por lo que ningún efecto legal podemos adscribirle. Contrario a lo que argumenta Calidad Ambiental en su oposición a los efectos de que "no existen disposiciones reglamentarias" que desautoricen la actuación del Ledo. Russe, el estatuto objeto de examen delega exclusivamente en "los miembros constituidos en Junta" todo lo relacionado a las declaraciones de impacto ambiental, 12 L.P.R.A. see. 1131(24), directriz que se recoge, además, en el reglamento cuando en todo momento se refiere a "la Junta", definida por éste como "la agencia" y a su 'Junta de Gobierno" como el cuerpo director responsable de implantar las funciones asignadas por dicha ley. A la luz de tales disposiciones, resulta insostenible la argumentación a los efectos de que el presidente de Calidad Ambiental es "la Agencia" o, por sí mismo, "su cuerpo director".
Concluimos así que la actuación del Ledo. Russe, recomendando unilateralmente a Planificación que se considerara la DIA-P como DIA-F, resulta ser un acto ultra vires que usurpa una facultad *761 delegada exclusivamente a "la Junta", actuación que esta curia no puede avalar. Además, fue emitida a destiempo sin que mediara oportunidad para que "la Junta" recibiera los comentarios del público y de las agencias concernidas, actuación que infringió asimismo el debido proceso a las recurrentes y que vició de nulidad la misma.
Al tenor de esta conclusión por nosotros alcanzada, Planificación estaba impedida de considerar la recomendación así recibida como base para convertir la DIA Preliminar sometida ante la consideración de Calidad Ambiental en una DIA Final, ello en cumplimiento del Art. 4(C) de la Ley Sobre Política Pública Ambiental, supra. Consecuencia obligada es la revocación de la resolución por ésta emitida teniendo por concluido el proceso de análisis ambiental, para así aprobar la consulta de ubicación para el proyecto Christopher Columbus Landing Resort.
IV
Por los fundamentos antes expuestos, se expide el auto solicitado para dictar sentencia revocatoria de las resoluciones recurridas. Dejamos así sin efecto la recomendación unilateral hecha por el Ledo. Russe a los efectos de que la Junta de Planificación acepte la DIA Preliminar sometida como la DIA Final; se revoca y deja sin efecto la Resolución emitida, mediante la cual y a base de tal recomendación se aprobó la consulta de ubicación que es ahora objeto de impugnación; y se ordena la reapertura del trámite administrativo para la continuación de los procedimientos en forma armoniosa con lo antes dispuesto. En particular, corresponderá a la Junta de Calidad Ambiental o sea, a "sus miembros constituidos en Junta", adoptar la determinación que corresponda, ello en el descargo de su encomienda fiscalizadora, asegurándose de que las "acciones" de toda "agencia proponente" sean cónsonas con la letra y el espíritu de lo que allí se promueve.
Lo acuerda y manda el Tribunal y así lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 98 DTA 20
1. Véase Resolución, Determinación de hecho Núm. 34, Apéndice del recurso, pág. 19.
2. Véase Moción de reconsideración, Apéndice del recurso, pág. 34.
3. Textualmente, lqfe errores señalados por la recurrente imputan que:

"1. Erraron la JP y la JCA al no seguir el procedimiento adecuado dispuesto por el estado de derecho vigente para aprobar la DIA-P y DIA-F, en violación al derecho constitucional al debido proceso de ley en su ámbito procesal y al acceso a información gubernamental.

2. Erró la JCA p/c de su Presidente, al dejar sin efecto la Resolución final y firme emitida previamente por la Junta de Gobierno y en violación a los deberes y responsabilidades delegados al Presidente y a la Junta, respectivamente, en las secciones 1130 y 1131, de la Ley de Política Pública Ambiental codificada en 12 L.P.R.A. see. 1130 y 1131.

3. Erró la JCA al convertir la DIA-P en DIA-F mediante un procedimiento exparte, sin oportunidad de análisis, discusión y consideración pública y en violación al debido proceso garantizado por la ley, el Reglamento sobre DIA y las Constituciones del Estado Libre Asociado de Puerto Rico en su Artículo II, sección 7y la de Estados Unidos en su Artículo XIV.

4. Erró la JP al no notificar ni conceder oportunidad de participación a los interventores recurrentes, ni al público en los procedimientos de suplementación de la DIA-P, y en la conversión de DIA-P en DIA-F en violación al debido proceso de ley en su ámbito procesal, garantizados por la Constitución del Estado Libre Asociado de Puerto Rico y la de Estados Unidos y en contravención a las propias Resoluciones emitidas por dicha agencia en este caso.

*762
5.Erró la JP como cuestión de derecho, al omitir, descartar y formular determinaciones de hechos contradictorias en su propia Resolución, así como en relación a las contenidas en la "Resolución y Notificación" final de la JCA del 29 de julio de 1996, violentando el proceso de análisis ambiental (DIA) llevado ante la JCA.

6.Erraron la JCA por conducto de su Presidente y la JP al relegar para la etapa de diseño los estudios hidrológicos requeridos por la JCA para la etapa de la aprobación, hecho que constituye una fragmentación del análisis ambiental, situación que prohíbe el Reglamento sobre DIA."

Según veremos y por el alcance de lo ahora resuelto, no habremos de discutir, por innecesario, los últimos dos errores imputados.
4. Se desprende del expediente que esta resolución fue notificada a todas las partes interesadas: Planificación, el proyectista, varios oficiales de Calidad Ambiental y a los deponentes que participaron en las vistas públicas. Véase Resolución de 11 de septiembre de 1995, Apéndice del recurso, págs. 56-57.
5. Véase Escrito en Oposición a Solicitud de Revisión de la Junta de Calidad Ambiental, pág. 3.
6. Véase Resolución de la Junta de Planificación de 3 de julio de 1996, Apéndice del recurso, pág. 59.
7. Al igual que la Resolución del 11 de septiembre de 1995, esta resolución fue notificada a todas las partes, surgiendo que la misma debía ser notificada "a todos los deponentes con dirección en el expediente de la vista pública". Véase Resolución de 29 de julio de 1996, Apéndice del recurso, pág. 47.
8. Véase Informe suplementario del Panel Examinador, Apéndice del recurso, págs. 53-54. Según se ha expuesto, este informe fue adoptado íntegramente por la Junta de Calidad Ambiental.
9. Véase Resolución de Planificación de 21 de agosto de 1996, Apéndice del recurso, pág. 65.
10. Véase Carta de 26 de noviembre de 1996, Apéndice del recurso, pág. 67. De su texto surge que copia de la misma fue enviada, entre otras, a las partes aquí recurrentes.
11. Véase Carta de 10 de diciembre de 1996, Apéndice del recurso, págs. 36-37.
12. Ello contrasta con las decisiones anteriores de Calidad Ambiental, las que fueron emitidas mediante Resolución aprobada por la Junta de Gobierno de dicha agencia, y notificadas a todos los que habían participado en el proceso de evaluación ambiental para dicho proyecto.
13. Véase Aviso Ambiental de 15 de diciembre de 1996, Apéndice de la recurrida Junta de Planificación, pág. 145.
14. El reglamento define dicho concepto como:
"[e]l efecto substancial (positivo o negativo) de una acción propuesta sobre uno o varios elementos del ambiente, tales como, pero sin limitarse a una población biótica, un recurso natural, el ambiente estético o cultural, la calidad de la vida, la salud pública, los recursos renovables y no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo o viceversa, disponiéndose que cada uno de los elementos aquí enumerados será evaluado independientemente y en conjunto". Sec. 2.1u.
15. La disposición no establece distinción alguna en cuanto a qué clase de DIA se refiere, por lo que es atinado concluir que el procedimiento allí establecido aplica en todo caso, trátese de una DIA, una DIA-P, una DIA actualizada, una DIA suplementada o una DIA Final siempre que el documento de que se trate necesite ser "comentado" de acuerdo al reglamento.
*763 16. Observamos así que esta disposición es cónsona con la letra y el espíritu de la ley y del reglamento que persiguen convertir el proceso de evaluación ambiental en uno abierto, en el cual no sólo el gobierno sea el que participe de la toma de decisiones que inciden sobre la conservación y la utilización de los recursos naturales y del medio ambiente, al fomentar e incorporar, así, el insumo del público en general en el descargo de la responsabilidad que allí se le reconoce al respecto. Art. 3(c), Ley Núm. 9, supra: Sec. 1.2a, Reglamento Núm. 3106, supra.
17. Nuevamente, de esta forma se garantiza que en el mejor descargo de su función fiscalizadora, Calidad Ambiental pueda contar con el insumo de todas aquellas partes a las cuales la ley y el reglamento les reconoce el derecho de participar en el proceso público que supone una declaración de impacto ambiental.
18. De acuerdo al esquema original de la ley, la Junta de Calidad Ambiental estaría compuesta de los cinco (5) Secretarios de las agencias de gobierno allí mencionados como miembros ex-ofício, además de tres personas nombradas por el Gobernador con el consejo y consentimiento del Senado. El Presidente de la Junta sería nombrado por el Gobernador de entre los miembros ex-ofício.
19. Esto surge de la Resolución adoptada por Planificación de fecha 3 de julio de 1996, la cual se hizo formar parte de los autos ante nuestra consideración. La aludida reunión de 6 de abril de 1995 constituyó la Tercera Extensión realizada a la consulta de ubicación de epígrafe.
20. Véase Resolución de la Junta de Planificación de 3 de julio de 1996, Apéndice del recurso, pág. 59.
21. Este hecho no está en controversia y, por el contrario, fue aceptado por la Junta de Calidad Ambiental en su alegato, al sostener que "le correspondía al Director Ejecutivo de la JCA el hacer la recomendación", criterio que no podemos avalar. Véase Oposición a solicitud de Revisión, pág. 9.